**UNITED STATES of America, Appellee,**

v.

**Joseph Edward COE,
Defendant–Appellant.**

**No. 166, Docket 89–1205.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 2, 1989.
Decided Nov. 30, 1989.

1989), which was decided after the sentencing in this case. For reasons given below, we conclude that the case must be remanded for resentencing.

Sarah A. Chambers, Asst. Fed. Public Defender, New Haven, Conn. (Thomas G. Dennis, Fed. Public Defender, New Haven, Conn., on the brief), for defendant-appellant.

Peter S. Jongbloed, Asst. U.S. Atty., New Haven, Conn. (Stanley A. Twardy, Jr., U.S. Atty., New Haven, Conn., on the brief), for appellee.

Before NEWMAN, PRATT, and MAHONEY, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal raises narrow but significant questions concerning the authority of a district judge to impose a sentence higher than the applicable range called for by the Sentencing Guidelines. Joseph Edward Coe appeals from the April 21, 1989, judgment of the District Court for the District of Connecticut (Ellen Bree Burns, Chief Judge) convicting him, upon a guilty plea, of bank robbery, in violation of 18 U.S.C. § 2113(a) (1982), and escape from federal custody, in violation of 18 U.S.C. § 751(a) (1982). Coe challenges only the sentence—a prison term of 135 months for the bank robbery and a concurrent term of 48 months for the escape. This sentence exceeded the top of the applicable guideline range by four years. Coe argues that this upward departure was unlawful because the sentencing judge impermissibly relied on factors that the Sentencing Commission had already considered in formulating the Guidelines and also failed to follow procedures adopted by this Court in *United States v. Cervantes,* 878 F.2d 50 (2d Cir.

## Facts

In early 1985, while serving a five-year term of imprisonment for bank robbery,[1] Coe received permission to be released from a correctional facility to a halfway house. According to the terms of the travel furlough, Coe was to leave the Federal Correctional Institution in Englewood, Colorado, on June 6, 1988, and fly, unescorted, to Hartford, Connecticut, where he was to report to the Watkinson Halfway House that evening. While on route to the airport in Colorado, Coe stopped at a local bank to withdraw approximately $1,700 from his savings account, receiving $1,000 in cash and the rest in a bank check. Although he took his scheduled flight from Colorado to Connecticut, somewhere along the way Coe apparently decided not to report to the halfway house. Instead, he boarded a bus to Atlantic City where he gambled and lost $1,000. On June 7, 1988, the Bureau of Prisons declared Coe an escapee.

After a few days in Atlantic City, Coe travelled to New Haven, where he convinced his mother to cash the bank check he had obtained in Colorado. Coe then returned to Atlantic City, gambled some more, and again lost his money. Penniless, he resurfaced in New Haven where, between June 13 and June 27, he robbed four banks and stole a car. At two of the bank robberies, Coe told bank tellers that he was carrying a gun. At the other two, he toted a rolled-up newspaper, presumably to give the impression that he was armed. At none of the robberies, though, did a bank employee see Coe in possession of a gun, and the Government has not claimed that he was armed during any of the four robberies. Finally, on June 1, 1988, Coe en-

---

1. This sentence was in satisfaction of a 1985 indictment in the District Court for the District of Connecticut charging Coe with four counts of bank robbery. Coe pled guilty to two of the bank robbery counts and admitted the other two other bank robberies charged in the indictment. On September 17, 1985, Judge Burns

(who also imposed the sentence in the pending case) sentenced Coe to a five-year term of imprisonment for the first bank robbery, a suspended eight-year term on the second, and a five-year term of probation upon his release from custody.

tered a savings bank in a neighboring town, waited in a line of customers, and then left. A bank employee reported Coe's suspicious behavior to the police. The police stopped the car Coe was driving and, upon discovering that it was stolen, arrested him. Coe was later placed in the custody of federal marshals because he was a federal escapee.

In a written agreement, Coe consented to waive indictment and to plead guilty to a two-count information charging him with one of the four bank robberies and with the escape. As part of the agreement, he also stipulated to the other three bank robberies and to having obtained a total of $6,708 from all four robberies. In the presentence investigation report, the Probation Office calculated that Coe's offense level was 21[2] and his criminal history category was V,[3] which indicated a sentence range of 70 to 87 months.

At sentencing, the District Court rejected Coe's request for a downward departure. Instead, Chief Judge Burns elected to depart upward from the applicable guideline range for the following reasons:

[I]n viewing the guidelines and where it brings us in terms of the appropriate sentence, it certainly seems to me that given this case, the guidelines do not appropriately take into account some of the factors which we are concerned with and that is that pattern of robbery that has taken place over a short span of time and the threat to the community which that suggests. Mr. Coe represented to the tellers at the various banks that he was armed. I think it is conceded that he was not, or at least the Government cannot prove that he was, and the Court will assume that he was not, but he represented to the bank personnel that he was armed. The potential for violence in a situation of that kind is enormous and the threat, therefore, to innocent bystanders always is present. This is a factor which the Court is also very much concerned about and it would appear that the most important factor in sentencing Mr. Coe is to [sic] going to be to protect the public from offenses which his previous pattern of behavior suggests that he is going to continue to commit.

Chief Judge Burns then imposed a sentence of 135 months on the bank robbery count and a concurrent term of 48 months on the escape count. The sentence of eleven and one-quarter years exceeded the top of the applicable guideline range by four years. The District Court also ordered Coe to make restitution of $6,708.

### Discussion

1. *Was the departure permissible under part 5K or part 4A?* Section 212(a)(2) of the Sentencing Reform Act of 1984, as amended, provides that a judge may impose a sentence outside the range established by the applicable guideline if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Com-

---

2. The base offense level for robbery, at the time of the offense charged in Count 1, was 18. U.S.S.G. § 2B3.1(a) (1987). One level was added because the robbery occurred at a bank. *Id.* § 2B3.1(b)(1). Under the multi-count analysis, U.S.S.G. §§ 3D1.1–.5 (1989), which is applicable to stipulated offenses, *id.* § 1B1.2(c), one "unit" was counted for each of the four robberies and one-half "unit" for the escape offense; the total of four and one-half "units" resulted in an increase of four levels, *id.* § 3D1.4. A reduction of two levels was made for acceptance of responsibility, *id.* § 3E1.1, producing an ultimate offense level of 21.

Effective November 1, 1989, the base offense level was increased to 20, and the offense characteristic of robbing a bank was increased to two levels. *Id.* § 2B3.1(a), (b)(1); *id.* App. C, amendment 110, at C.55.

3. In determining the criminal history category, three points were counted for the September 17, 1985, five-year sentence for bank robbery, two points for a March 26, 1985, 90–day sentence for third degree larceny, and three points for a September 20, 1985, three-year sentence for first degree larceny. U.S.S.G. § 4A1.1(a), (b). Two points were added because Coe was on parole when he committed the instant offenses, *id.* § 4A1.1(d), and one point (normally two unless two points are added under § 4A1.1(d)), was added because the instant offenses were committed within two years after release from imprisonment, *id.* § 4A1.1(e). The total of 11 points placed Coe in Criminal History Category V, *id.* ch. 5, pt. A (sentencing table).

mission in formulating the guidelines...." 18 U.S.C. § 3553(b) (Supp. V 1987). The Guidelines establish two different ways in which sentencing judges may exercise their discretion to depart from an applicable guideline range. The general authority is set forth in part 5K, which governs most departures. Tracking the statutory authority of section 3553(b), section 5K2.0 authorizes a departure if a case involves an aggravating or mitigating factor not given adequate consideration by the Commission or "if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." United States Sentencing Commission, *Guidelines Manual* § 5K2.0, at 5.42 (1989) [hereinafter "U.S.S.G. _____"]; *see United States v. Correa–Vargas,* 860 F.2d 35, 37–38 (2d Cir.1988). Part 5K provides further guidance by identifying several considerations that may appropriately warrant departures, U.S.S.G. §§ 5K2.1–5K2.15, and part 5H identifies certain considerations that "ordinarily" do not warrant departures, *id.* at §§ 5H1.1–.6.

A more limited authority for departures is set forth in part 4A, which concerns the determination of the appropriate criminal history category, the horizontal axis of the sentencing table. Section 4A1.3 authorizes a departure if the appropriate criminal history category, as determined pursuant to section 4A1.1, "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes...." [4]

*See United States v. Sturgis,* 869 F.2d 54, 56 (2d Cir.1989).

Prior to our decision in *United States v. Cervantes, supra,* it made no difference whether a judge making a departure used the authority of part 5K or part 4A. That decision, however, imposed procedural requirements upon 4A departures that do not apply to 5K departures. We consider the nature and application of those 4A procedures in Part 2, *infra.* At this point, it suffices to note that the requirement of those procedures makes it important to determine, for all departures made after the decision in *Cervantes,* whether the departure was made under part 4A, where the procedures apply, or under part 5K, where they do not. Since Coe was sentenced before *Cervantes* was decided, it is entirely understandable that Chief Judge Burns saw no need to identify which of the two departure provisions she was applying. Her helpful explanation of the reasons for her departure, however, enables us to identify the three aggravating factors on which her decision to depart was based and determine whether each is a permissible factor and whether reliance upon it is authorized by part 4A or 5K.

■ The first factor mentioned by Chief Judge Burns was the "pattern of robbery that has taken place over a short span of time." Section 4A1.3(e) permits prior misconduct not resulting in conviction to be counted in determining the appropriate criminal history category. However, where a defendant commits a series of similar crimes, it would be elevating form

---

**4.** The 5K and 4A departures discussed at this point concern departures involving broad exercises of discretion. Departures of this sort are to be distinguished from other types of departures that are more structured. For example, the commentary to section 2G1.1 recommends a downward adjustment of 8 levels from the base offense level of 14 for prostitution if the offense was not committed for profit and did not involve force. The Commission calls this type of departure an instance where "specific guidance for departure" is provided. U.S.S.G. ch. 1, pt. A, § 4(b), at 1.7. Prior to November 1, 1989, the Commission had classified as a distinct category of departures those instances where a court is entitled to make an "interpolation between two adjacent, numerically oriented guideline rules." U.S.S.G. ch. 1, pt. A, § 4(b), at 1.7 (1987). For example, the specific offense characteristics for offenses against the person provide for increases of two, four, or six levels, depending on whether the victim suffered bodily injury, serious bodily injury, or permanent or life-threatening bodily injury. U.S.S.G. § 2A2.1(b)(3). Prior to November 1, 1989, the Commission had advised, "If the degree of bodily injury falls between two injury categories, use of the intervening level (*i.e.,* interpolation) is appropriate." U.S.S.G. § 2A2.1, application note 2 (1987). A November 1, 1989, amendment eliminates the classification of such interpolation as a departure, U.S.S.G. app. C, amendment 68, at C.36–37; the interpolation technique remains available in the form of a more refined set of offense characteristic adjustments. *See, e.g., id.* § 2A2.1(b)(3)(D), (E).

over substance to regard the early episodes in the series as "prior criminal history" simply because the defendant pled guilty to the last in the series, rather than the first. Moreover, section 1B1.3(a)(2) defines "relevant conduct" for purposes of calculating the offense level to include "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction."[5] And section 1B1.2(a) provides that where a defendant stipulates to the commission of additional offenses, as Coe did in this case, those offenses are treated, for purposes of calculating the offense level, as though the defendant had been convicted of separate counts charging those offenses.[6] The pattern of robberies occurring in the two-week period prior to Coe's arrest is therefore not a "criminal history" factor required to be analyzed under the departure authority of part 4A. Whether it is a permissible factor for a part 5K departure requires further consideration.

■ Coe contends that the pattern of four robberies in June 1988 may not be used to justify a part 5K departure because related conduct of this sort had already been taken into account by the Commission in formulating the Guidelines. To the extent that Chief Judge Burns departed because of the *fact* that Coe committed the June 1988 robberies, reliance on this factor was not permissible because the Guidelines provide a precise method for calculating the incremental punishment appropriate, in the Commission's judgment, for each of the robberies. That method, the multi-count analysis of sections 3D1.1–.5, was used in Coe's case in determining his offense level and resulted in a four-level increase of his base offense level for the robbery to which he pled guilty. To depart upwards because of these four robberies after each had been counted in determining Coe's offense level would be impermissible double-counting.

■ However, Chief Judge Burns also relied on the *timing* of the four robberies, noting the "short span of time" during which they occurred. Whether the timing of these crimes permitted a departure is a closer question. Nothing in the Guidelines explicitly indicates that the Commission considered the shortness of the time period in which a defendant committed crimes that constitute "relevant conduct" or are stipulated offenses subject to "multi-count" analysis. Two inferences are possible. The Commission may never have considered the time factor, thereby leaving it available as a ground for departure as an aggravating factor. Or the Commission may in fact have considered the possible relevance of the time span and concluded that no incremental punishment was appropriate for committing offenses during a brief interval, beyond the added punishment mandated for the offenses themselves. We draw the latter inference. In the first place, the Commission gave detailed attention to the method for calculating the incremental punishment for crimes a defendant admits, in addition to the crimes to which he formally pleads guilty. Normally, such crimes would be committed in a relatively brief period of time prior to the offense of conviction, a circumstance not likely to have been overlooked by the Commission. Secondly, though the phrase "crime spree" may evoke from the public an emotional response, it is far from clear why the frequency of four robberies committed in a two-week period is an aggravating factor meriting more punishment than the commission of such crimes at six-month intervals over the course of a year and one-half or at one-year intervals over the course of three years. Arguably, the latter two patterns indicate a more methodical and cunning criminal who resorts to robbery whenever his funds are low, whereas Coe's pattern reveals a somewhat reckless criminal whose repetitive offenses within two weeks (and in the same community)

---

5. Section 1B1.3(a)(2), amended effective January 15, 1988, *see* U.S.S.G. app. C, amendment 3, carries forward the prior language of section 1B1.3(a)(1), with a limitation not applicable to this case.

6. This provision was added to section 1B1.2(a), effective January 15, 1988. *See* U.S.S.G. app. C, amendment 2. The provision is now contained in section 1B1.2(c).

greatly increased the likelihood that he would be caught. We conclude that the timing of the June 1988 robberies did not warrant a 5K departure, once the offense level calculation had resulted in incremental punishment for each of these crimes.

■ The second factor identified by Chief Judge Burns was Coe's representation to bank personnel during the course of the bank robberies that he was armed. As the District Judge pointed out, these claims, though unfounded, created a potential for violence with a risk of harm to bystanders. Since this factor concerns the nature of Coe's offense conduct and has nothing to do with his prior criminal history, it could justify a departure, if at all, only under part 5K. In formulating the Guidelines, the Commission gave explicit consideration to the various ways in which a robber might exacerbate the element of "force and violence, or ... intimidation," which distinguishes robbery from larceny, 18 U.S.C. § 2113(a), (b). The Commission recognized that a victim's fear and the risk of injury to a victim and to by-standers warranted more serious punishment depending on the various ways the robber might handle a firearm and the nature of the robber's intimidation. The Guidelines specify that the base offense level for robbery is to be increased by five levels if a dangerous weapon, including a firearm, is discharged, by four levels if such a weapon is otherwise used, by three levels if such a weapon is brandished, displayed, or possessed, and by two levels if an express threat of death is made. U.S.S.G. § 2B3.1(b)(2). Surely the Commission was aware that many unarmed robbers claim to be armed. In light of the precise consideration the Commission gave to the significance of the use of a firearm and the nature of a threat in the course of a robbery, carefully calibrating offense levels to the various types of firearm use and to an express death threat, we conclude that the Commission elected not to authorize increased punishment for claiming to be armed. Apparently, this circumstance was considered an unexceptional means of satisfying the intimidation element of the crime. This factor was therefore an impermissible basis for a 5K departure.[7] Cf. United States v. Uca, 867 F.2d 783 (3d Cir.1989) (rejecting upward departure taken on the basis of the number of guns, their untraceability, and their potential use, because Commission had taken these considerations into account).

■ The third factor relied on by Chief Judge Burns for the upward departure, which she characterized as the "most important," was "the need to protect the public from offenses which [Coe's] previous pattern of behavior suggests that he is going to continue to commit." Unquestionably, this factor falls within the purview of part 4A, rather than part 5K, since it precisely concerns prior criminal history. In calibrating the degree of punishment according to the extent of a defendant's prior criminal history, the Commission was mindful not only of the just deserts rationale of punishment but also of the greater risk of recidivism posed by a defendant with an extensive criminal record. As the Commission noted, "Repeated criminal behavior is

---

7. The Commission has identified only a few factors that may not be used as a basis for a departure. See U.S.S.G. §§ 5H1.4 (third sentence), 5H1.10, 5K2.12 (last sentence). Apart from these factors, however, the Commission has stated that it "does not intend to limit the kind of factors (whether or not mentioned anywhere else in the guidelines) that could constitute grounds for departure *in an unusual case.*" *Id.* ch. 1, pt. A, § 4(b), at 1.6 (emphasis added). In concluding that a false claim of gun possession may not be used for a departure in view of the precise offense characteristics prescribed for weapons in connection with robbery offenses, we are not precluding a departure based on some unusually cruel use of a weapon. Our point is only that a false claim of weapon possession does not make a bank robbery an "unusual case" justifying a departure.

The District Court did not find that Coe's use of a newspaper at two of the robberies in such a manner as perhaps to suggest concealment of a gun sufficed to warrant the three-level enhancement for possession of a dangerous weapon, *see* U.S.S.G. § 1B1.1, comment n. 1(d) ("Where an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon."), nor that his statements or actions at any of the banks sufficed to warrant the two-level enhancement for an express threat of death.

an indicator of a limited likelihood of successful rehabilitation." U.S.S.G. ch. 4, pt. A, intro. comment. The Commission included in the point score for determining the appropriate criminal history category not only the number of prior convictions but also their proximity to a defendant's most recent encounter with the law. Two points are added to the criminal history score if the defendant committed the offense while under any criminal justice sentence (including a parole term), *id.* § 4A1.1(d), and two points are added if the defendant committed the instant offense less than two years after release from imprisonment, *id.* § 4A1.1(e), although the combined effect of these two factors may not exceed three points. *Id.* All three points were added to reach Coe's point total of 11, which placed him in Criminal History Category V. Though Coe contends that his prior criminal record and the risk of future crimes indicated by that record were already accounted for in the determination of his criminal history category and therefore could not justify an upward departure, his argument is fully answered by section 4A1.3, which explicitly permits a departure whenever the "criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes...." These inadequacies of Coe's criminal history category were, therefore, permissible bases for a 4A departure.

■ 2. *Was the departure properly made under part 4A?* Though *Cervantes* was decided after Coe's sentencing, the procedure we outlined in that decision is fully applicable to Coe's case since his case is now on direct review. *See Griffith v.*

*Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). In *Cervantes,* a defendant whose prior record placed him in Criminal History Category I was sentenced on the basis of his prior record to a term appropriate for a defendant in Criminal History Category IV. Though recognizing the authority of the sentencing judge to conclude that Category I did not adequately reflect the seriousness of the defendant's record and the consequent authority of the judge to make an upward departure, we did not permit the judge simply to select any sentence above the applicable sentencing range but instead imposed two procedural requirements, drawn from the wording and the rationale of part 4A. *See United States v. Jackson,* 883 F.2d 1007, 1009–10 (11th Cir.1989); *United States v. Miller,* 874 F.2d 466, 470–71 (7th Cir.1989); *United States v. Lopez,* 871 F.2d 513, 514–15 (5th Cir.1989). First, the judge was obliged to "determine which category [of those higher than the category determined from the defendant's criminal history point score] best encompasses the defendant's prior history" and then "use the corresponding sentencing range for that category 'to guide its departure.'" 878 F.2d at 53 (quoting U.S.S.G. § 4A1.3).[8] In *Cervantes,* that meant that a departure could not go as high as a sentence within the range applicable to a defendant in Category IV unless the judge determined that Cervantes' record, realistically assessed, most closely resembled those of defendants in that category. Second, the judge was obliged to proceed sequentially through the categories, considering whether the next higher category adequately reflected the seriousness of the defendant's record and,

8. Section 4A1.3 states in pertinent part:

In considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable. For example, if the court concludes that the defendant's criminal history of III significantly under-represents the seriousness of the defendant's criminal history, and that the seriousness of the defendant's criminal history most closely resembles that of most defendants with a Category IV criminal history, the court should look to the guideline range specified for a defendant with a Category IV criminal history to guide its departure. The Commission contemplates that there may, on occasion, be a case of an egregious, serious criminal record in which even the guideline range for a Category VI criminal history is not adequate to reflect the seriousness of the defendant's criminal history. In such a case, a decision above the guideline range for a defendant with a Category VI criminal history may be warranted.

U.S.S.G. § 4A1.3.

only upon finding it inadequate, moving on to a still higher category. In *Cervantes*, we asked the sentencing judge to explain why Category IV better reflected the seriousness of his prior record than Category II or Category III. *Id.* at 54.

The reason for obliging a judge to examine the next higher categories in sequence is that these categories reflect the Commission's careful assessment of how much incremental punishment a defendant should receive in light of the various degrees of a prior record. In formulating the Guidelines in general and the criminal history categories in particular, the Commission sought to implement a congressional policy of lessening disparity by narrowing, though not eliminating, the discretion of sentencing judges. At the same time, the Commission specified for each criminal history category a range of available sentences, in this case, seventeen months, so that a sentencing judge could somewhat adjust the sentence to reflect the unique characteristics of each case. In light of the Commission's careful construction of the criminal history categories, when a judge concludes that a defendant's category is inadequate, a sentence in the range of the next higher category will usually be sufficient. At least that next higher category must be considered and found inadequate before considering an even higher category. We recognized in *Cervantes* that in extraordinary circumstances, even the highest of the six categories might be inadequate. But, as we noted, "[O]nly the most compelling circumstances—for example, prior misconduct accompanied by wanton cruelty" would justify a 4A departure above Category VI. *Id.* at 55.

The Government contends that the sequential approach of *Cervantes* applies only where the criminal history category does not adequately reflect "the seriousness of the defendant's past criminal conduct," but not where the category does not adequately reflect "the likelihood that the defendant will commit other crimes." U.S. S.G. § 4A1.3. We see no basis for this narrow reading of *Cervantes*. In its Introductory Commentary to Chapter Four, the Commission expressly states that its formula for calculating a defendant's criminal history score was guided by empirical research demonstrating a link between past criminal behavior and the likelihood of recidivism. The procedural requirements of *Cervantes* apply equally to both of the reasons specified in section 4A1.3 why a criminal history category might be inadequate in a particular case.

Coe's final claim is that the extent of departure in the present case was impermissible. The imposed sentence of 135 months surpassed the highest possible sentence in the applicable guideline range by just over four years. On appeal, our scope of review with respect to the extent of a departure is limited to determining whether a sentence imposed outside the guideline range is "unreasonable." 18 U.S.C. § 3742(d)(3) (Supp. V 1987). *See United States v. Sturgis*, 869 F.2d at 57 (imposition of sentence of sixty months not unreasonable under circumstances); *cf. United States v. Hernandez–Vasquez*, 884 F.2d 1314 (9th Cir.1989) (vacating sentence because extent of departure too great for particular aggravating factor). At this point, however, we do not have to assess the reasonableness of the length of the imposed sentence. Although the extent of a permissible departure is not boundless,[9]

---

**9.** The extent of an upward departure is obviously bounded by the statutory maximum penalty and by the standard of reasonableness by which a court of appeals reviews a sentence outside the applicable guideline range. 18 U.S.C. § 3742(f)(2). Two factors indicate the appropriateness of some caution in deciding upon the extent of an upward departure. First, there is the general policy of lenity in the construction of criminal statutes. *See Busic v. United States*, 446 U.S. 398, 407, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980). Though that policy normally applies in aid of interpretation of ambiguous

provisions of criminal statutes, it may exert moderating force in the implementation of a complex regulatory scheme affecting criminal sentences. Second, the context in which upward departures are considered frequently differs from the context of many downward departures. The latter are often considered by a judge deciding whether to impose a sentence of probation rather than the bottom of a guideline range specifying a term of 12 or 18 months. In that context, the departure involves at most a decision to depart to a limited extent. An up-

we believe that on remand *Cervantes*'s procedural requirements will provide a sufficient framework for guiding an upward departure based on the inadequacy of the relevant criminal history category.

### Conclusion

Since the only permissible grounds for an upward departure—the seriousness of Coe's prior record and the consequent likelihood of his committing future crimes— were available for consideration only as a 4A departure and since the *Cervantes* procedures required for such a departure were not followed, we vacate the sentence imposed on Coe and remand to the District Court for resentencing consistent with this opinion.

ward departure, however, occurs within a range from the top of the applicable guideline up to the statutory maximum, an area that will often cover an extensive span of imprisonment. In Coe's case, for example, the difference between the top of his guideline range (87 months) and

the statutory maximum (20 years) is 12¾ years. In an era of flat time sentencing without parole, the extent to which a sentence departure should traverse such a broad span is a matter deserving of caution.