UNITED STATES of America, Appellee,

v.

Lorenzo NICHOLS, Defendant,

Appeal of Claudia MASON and Char T. Davis, a/k/a "Shocker", Defendants.

Nos. 1330, 1510, Dockets 90–1048, 90–1078.

United States Court of Appeals, Second Circuit.

Argued June 7, 1990.

Decided Aug. 27, 1990.

Philip Katowitz, New York City, for defendant-appellant Claudia Mason.

Susan G. Kellman, New York City, for defendant-appellant Char T. Davis.

Leslie R. Caldwell, Asst. U.S. Atty., E.D. N.Y. New York City (Andrew J. Maloney, U.S. Atty., David C. James, Asst. U.S. Atty., of counsel), for appellee.

Before VAN GRAAFEILAND, MINER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Claudia Mason and Char T. Davis appeal from judgments of conviction, entered in the United States District Court for the Eastern District of New York (Edward R. Korman, *Judge*), for conspiracy to distribute and possession with intent to distribute cocaine base. On this appeal, defendant-appellant Mason contends that the district court committed reversible error by failing to provide the jury with a "missing witness" charge. Mason also challenges the district court's refusal to suppress evidence discovered in her safe deposit box and its failure to instruct the jury on the government's failure to preserve certain evidence. Defendant-appellant Davis does not challenge his conviction but does challenge the sentence imposed on him. According to Davis, the district court improperly departed from the application of Sentencing Guidelines' Criminal History Category III to the application of Criminal History Category VI. For the reasons set forth below, we affirm the judgments of the district court.

## BACKGROUND

The convictions of Claudia Mason and Char T. Davis arose from their involvement in a large and violent narcotics organization, known as the "Bebos." The Bebos, under the direction of Howard "Pappy" Mason, distributed approximately one kilogram of crack per week between February

1988 and mid-August 1988. Howard Mason controlled the Bebos while incarcerated in various New York State prisons, using prison telephones and personal visits to transmit his orders.

At trial, the evidence established that Howard Mason's mother, defendant-appellant Claudia Mason, was an active liaison between her son and the Bebos organization. According to Viola Nichols, an accomplice in the Bebos' distribution operation, Claudia Mason regularly relayed instructions concerning narcotics activity from Howard Mason to Bebos members. In addition to acting as a conduit for instructions, Claudia Mason monitored the activities of various Bebos members to ensure their compliance with Howard Mason's instructions. For example, in March 1988, Claudia Mason informed Viola Nichols that Bebos member Albert Ingram would be "stripped up" for failing to properly perform his narcotics-related duties, which included the delivery of cocaine and money. Shortly thereafter, Claudia Mason ordered Ingram to return narcotics and money, as well as a van and a car he had been using, to her and Bebos member Vanessa Branch. The amount of narcotics and money returned by Ingram fell short of Mason's expectations, however, and she demanded that he produce additional narcotics and money. Claudia Mason's role in the Bebos organization was corroborated by approximately 65 recorded phone conversations intercepted under a court-authorized wiretap on her home telephone.

The government also introduced evidence obtained in a search of Claudia Mason's home. The search was authorized by a warrant based upon a confidential informant's affidavit describing Mason's recruitment of the informant to package narcotics at Mason's residence and numerous wiretapped phone conversations. The search was led by FBI Agent Theodore Gardner. Agent Gardner testified that the following items were discovered in a bedroom in Claudia Mason's home: approximately one kilogram of crack, some of which had been packaged into vials; a loaded handgun; a pair of earrings marked "Bebo"; and, two safe deposit box keys. FBI Agent Christopher Favo testified that a search of Claudia Mason's safe deposit box revealed jewelry, some of which was marked "Bebo", and $19,800 in cash. The cash was seized and, in accordance with FBI procedure, was deposited with the United States Marshals. Neither the dates nor the serial numbers of the currency were recorded before it was deposited.

Mason was convicted of conspiracy to distribute and possess with intent to distribute cocaine base and of possession with intent to distribute cocaine base. She was sentenced to two concurrent terms of 120 months' imprisonment.

The role of defendant-appellant Char T. Davis in the Bebos organization was less commanding, though no less active. The trial testimony of Viola Nichols established that, several times per week, Davis transported processed crack from Bebos member Paris Williams to various Bebos workers for packaging. Davis then distributed the packaged crack to street sellers and collected sales proceeds, which he used, in part, to pay the workers. Nichols' description of the role played by Davis in the Bebos organization was corroborated by wiretap evidence. Following trial, Davis was convicted of conspiracy to distribute and possess with intent to distribute cocaine base.

Davis' record of criminal activity did not begin with the Bebos' narcotics operation. Davis' presentence report describes his attempted murder of Rufus Parsely in 1986. In the attack on Parsely, Davis inflicted five gunshot wounds, leaving the victim partially paralyzed. Because Davis was a juvenile at the time of his attempted murder of Parsely, he received a lenient sentence for the attack. Immediately upon his release from juvenile jail in June 1988, Davis became involved in the Bebos organization's street-level operations. However, his unlawful activities following release from juvenile jail were not limited to the Bebos' narcotics operation. At a November 1989 pre-sentencing hearing, the government introduced evidence of Davis' involvement in the brutal murder of Charlene Baskerville. At that hearing, New

York City Police Detective Richard Eisner testified that on June 17, 1988, Baskerville was attacked with a cast-iron frying pan while in her apartment, which was located in the building in which Davis lived. She was found, with her head in a plastic garbage bag, lying in the entry-way of her blood-covered apartment. Five days after the attack, Baskerville died as a result of her injuries. Detective Eisner further testified that several unidentified persons living in the vicinity of Baskerville's apartment building indicated that Char T. Davis was involved in the murder. Moreover, a confidential informant provided a written statement implicating Davis in the Baskerville murder. That statement provided a detailed description of the attack on Baskerville which was consistent with the physical evidence found at the crime scene. The government also proffered the testimony of Viola Nichols that Davis had told her he killed a girl named Charlene in June 1988 by hitting her on the head. The sentencing judge considered this testimony "worthy of belief" because Nichols "had no special motive even to mention this to the government," let alone to lie about it. Finally, the testimony of Davis' family members that Davis was at home during the time period in which the Baskerville murder was committed was found not to be credible by the sentencing judge. Wiretap evidence indicated that Davis was not in his apartment during that period.

Based upon the evidence of Davis' involvement in the Baskerville murder, his violent juvenile record, and his involvement in the Bebos narcotics activities, the district court departed from Criminal History Category III to Criminal History Category VI in sentencing Davis. Application of the sentencing range corresponding to Category VI yielded a sentence for Davis of 405 months' imprisonment, an upward departure of 112 months. This appeal followed.

## DISCUSSION

### A. Defendant-appellant Mason

Defendant-appellant Mason claims that the district court erred by failing to provide the jury with a "missing witness" charge.

She contends that a missing witness charge was required because, while numerous law enforcement agents were involved in the August 1988 search of her home, only the search team's leader testified at trial. According to Mason, Agent Gardner was not present at the initial entry of her home and only the non-testifying agents could have revealed the exact location of the seized narcotics upon the agents' initial entry. Mason did not propose any specific language for the charge and rejected the "uncalled witness" charge initially offered by Judge Korman. She now claims that the Judge's eventual refusal to provide any missing witness charge was reversible error. We disagree.

A missing witness charge permitting the jury to infer that the testimony of an unproduced witness would have favored one party is appropriate if production of the witness is "peculiarly within [the] power" of the other party. *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir.1988) (quoting *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893)). However, if the unproduced witness is "equally available to both sides, 'the failure to produce is *open* to an inference *against both parties.*'" *Id.* (quoting 2 Wigmore, *Evidence* § 288, at 208 (Chadbourn rev.1979) (emphasis in original)). Should a witness that is equally available to both parties not be called to testify, the district court may, as it initially offered in this case, provide a charge which permits unfavorable inferences against either party. *See United States v. Carr*, 584 F.2d 612, 618 (2d Cir.1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *United States v. Erb*, 543 F.2d 438, 444–45 (2d Cir.), *cert. denied*, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976); L. Sand, J. Siffert, W. Loughlin, & S. Reiss, *Modern Federal Jury Instructions* ¶ 6.04, at 6–22 (1990). However, whether to provide the jury with a missing witness charge is committed to the "sound discretion" of the trial judge, and will not be disturbed absent an abuse of that discretion. *Torres*, 845 F.2d at 1170–71; *United States v. Miranda*, 526 F.2d 1319, 1330–31 (2d Cir.

1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976).

■ Mason contends that production of the agents who participated in the search of her home was in the "peculiar control" of the government and that their testimony was practically unavailable to her. We recognize that there exists a close relationship between law enforcement agents and prosecutors. However, "the availability of a witness ... depend[s] ... on all the facts and circumstances bearing upon the witness's relation to the parties." *Torres,* 845 F.2d at 1170 (citation omitted). In this case, there is no evidence that the testimony of the search team agents was unavailable to Mason. Prior to trial, the names of the search team agents were provided to Mason in a report prepared by Agent Gardner. In fact, the prosecutor expressly offered to make the agents available to testify as defense witnesses. Despite the availability of the agents, Mason made no effort to call them as witnesses. Under these circumstances, it appears that the agents' testimony was equally available to Mason and the government. Accordingly, no missing witness charge was required. *See id.* at 1169; *Erb,* 543 F.2d at 445; *United States v. Dixon,* 536 F.2d 1388, 1394 (2d Cir.1976).

■ Defendant-appellant Mason also contends that the search warrant authorizing a search of her apartment and safe deposit box was not supported by adequate probable cause. In particular, Mason argues that the confidential informant's affidavit supporting the warrant was not clearly reliable because the affidavit and complaint contained inconsistent references to the informant's gender and that the allegations contained in the affidavit were uncorroborated. Mason also argues that, based on these deficiencies in the warrant application, the searching agents could not possibly have acted in good faith reliance on the warrant. Accordingly, she claims that the evidence seized from her home and safe deposit box should have been suppressed by the district court. Again, we disagree.

A magistrate's finding of probable cause to believe that evidence of a crime would be found on a defendant's premises is entitled to substantial deference on appeal. *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). In the instant case, the magistrate was presented with sufficient information to determine that probable cause for the search existed. Contrary to Mason's suggestion, the confidential informant had proved to be a reliable source of government information on previous occasions. Moreover, wiretap evidence corroborated the informant's statements regarding Mason's ongoing involvement in narcotics activity. The government's inconsistent references to the informant's gender are not material to the issue of probable cause. *See United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). Moreover, the inconsistent references do not appear to have been made "intentionally, knowingly, or with reckless disregard for the truth." *Id.* (citing *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978)). Finally, even if the inconsistent gender references were considered fatal to the informant's affidavit, the government's wiretap evidence provided "independent and lawful information sufficient to support probable cause." *Id.* at 849 (citing *United States v. Lace,* 669 F.2d 46, 48–49 (2d Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982)).

Mason's final contention is that, by depositing the cash seized from her safe deposit box without recording the currency's serial numbers, the government failed to preserve exculpatory evidence for her defense. Mason apparently claims that the $19,800 discovered in her safe deposit box was a legitimate "cash hoard" accumulated from $250 per month rental income, jai alai gambling winnings, and social security payments. Accordingly, she challenges the district court's failure to declare a mistrial or to provide the jury with a charge permitting a negative inference against the government for failure to preserve the cash.

■ The district court's refusal to declare a mistrial was proper. "[U]nless a

criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). In the present case, Mason has offered no reason to believe that preservation of the cash would have yielded exculpatory evidence. It is difficult to imagine how recording the currency's serial numbers could have assisted Mason's defense unless she herself had recorded such information for her legitimately earned funds. Even if the government had preserved the cash or recorded the serial numbers, Mason has presented no reason to believe she could have connected those funds to the legitimate sources she alleges. Mason has not established "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Elusma,* 849 F.2d 76, 79 (2d Cir.1988), *cert. denied,* —— U.S.——, 109 S.Ct. 1570, 103 L.Ed.2d 936 (1989) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985)). In fact, the exculpatory effect of such evidence is so far-fetched that we decline to find any bad faith on the part of the officers who, in accordance with standard procedure, deposited the funds without recording the serial numbers.

Moreover, it was not error for the district court to refuse to charge the jury that it could draw an inference against the government from its failure to preserve or record the serial numbers of the seized cash. As in the instance of a missing witness charge, whether to instruct the jury on the permissibility of such an inference is committed to the discretion of the district court. In the present case, the court requested that Mason submit an affidavit stating that the money was a cash hoard derived from legitimate sources before he would provide the requested instruction. Mason declined to submit such an affidavit, and the charge was not provided. Under these circumstances, and considering the far-fetched nature of Mason's cash hoard theory, the district court's refusal to provide the requested instruction was not an abuse of discretion.

**B. Defendant-appellant Davis**

■ Defendant-appellant Davis initially contends that application of the preponderance of the evidence standard to disputed sentencing factors likely to result in a significant upward departure from the recommended sentencing range violates due process. We disagree. This Circuit has consistently held that, in considering the factual basis for an upward departure, the appropriate standard of proof is the preponderance of the evidence standard. *See, e.g., United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 182 (2d Cir.1990); *United States v. Rivalta,* 892 F.2d 223, 230 (2d Cir.1989); *United States v. Guerra,* 888 F.2d 247, 251 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). Davis invokes the language in *United States v. Lee,* 818 F.2d 1052, 1058 (2d Cir.) (Oakes, *C.J.,* concurring), *cert. denied,* 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987), that "at some future time in some other context" the clear and convincing evidence standard of proof may be appropriate for sentence enhancements. However, Davis fails to offer a persuasive argument that now is such a time or that this case presents such a context. Considering this Circuit's consistent application of the preponderance of the evidence standard of proof to disputed sentencing factors, we reject Davis' argument that a higher standard of proof should apply in this case.

Davis contends that, even under the preponderance of the evidence standard, there is insufficient evidence to establish his involvement in the murder of Charlene Baskerville. In our view, however, the sentencing judge's determination that Davis was involved in the Baskerville murder was not clearly erroneous. Accordingly, this factual determination will not be disturbed. *See* 18 U.S.C. § 3742(e) (1988); *United States v. Lanese,* 890 F.2d 1284, 1291 (2d Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990).

The evidence connecting Davis to the Baskerville murder included a confidential

informant's written statement which provided a detailed account of the murder and Davis' role therein. Davis challenges the propriety of relying on the confidential informant's statement since the identity of the informant was never revealed. However, a sentencing judge may rely on such evidence provided there is "good cause for not disclosing [the identity of the source], and the information he furnishes is subject to corroboration by other means." *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir.1989) (quoting *United States v. Fatico*, 579 F.2d 707, 709 (2d Cir.1978)). In the present case, good cause existed for not disclosing the confidential informant's identity. Davis' involvement in the Bebos organization created a reasonable fear of violent retribution for testimony against Davis. Moreover, the confidential informant's testimony was corroborated by physical evidence from the murder scene, by the interviews conducted by Detective Eisner during his investigation, and by the proffered testimony of Viola Nichols that Davis had admitted to her his involvement in the murder. Although Davis now challenges the credibility of Nichols as a corroborative witness, this attack cannot be maintained because Davis expressly waived his right to cross-examine Nichols at the pre-sentencing hearing. *See Lee*, 818 F.2d at 1057.

■ Finally, Davis contends that even if a preponderance of the evidence established his involvement in the Baskerville murder, the district court erred in applying Criminal History Category VI at his sentencing. We disagree.

Section 4A1.3 of the Sentencing Guidelines provides that, "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes," a higher Criminal History Category may be applied. U.S. S.G. § 4A1.3 at 4.9. In upwardly departing under this section, "the Guidelines require a judge to 1) determine which category best encompasses the defendant's prior history, and 2) use the corresponding sentenc-ing range for that category 'to guide its departure.'" *United States v. Cervantes*, 878 F.2d 50, 53 (2d Cir.1989) (quoting U.S. S.G. § 4A1.3 at 4.9). *See also United States v. Coe*, 891 F.2d 405, 412 (2d Cir. 1989). In considering which category to apply, the sentencing judge must "proceed sequentially through the categories, considering whether the next higher category adequately reflect[s] the seriousness of defendant's record." *Id.* at 412; *see Cervantes*, 878 F.2d at 54–55; U.S.S.G. § 4A1.3 at 4.9. In egregious cases, such as those involving "prior misconduct accompanied by wanton cruelty," *Coe*, 891 F.2d at 413 (quoting *Cervantes*, 878 F.2d at 55), an upward departure even above the sentencing range corresponding to Criminal History Category V[5] may be appropriate, *id.* In making any upward departure, the court must clearly articulate its grounds for the departure and must provide defendant's counsel with notice and an opportunity to present argument concerning the departure. *Cervantes*, 878 F.2d at 54–56.

The sentencing judge's determination that the nature and extent of Davis' prior criminal conduct warranted an upward departure from Category III to Category VI was not an abuse of discretion. *See Coe*, 891 F.2d at 409 n. 4. This determination was based on Davis' violent attempted murder of Rufus Parsley, for which he received lenient juvenile offender treatment, *see* U.S.S.G. § 4A1.3 (commentary) at 4.10, and Davis' involvement in the Baskerville murder. The basis for this departure was articulated by the sentencing judge at a January 1990 hearing. Judge Korman expressly referred to the seriousness of Davis' prior criminal acts and to his belief that any lessor category failed to reflect Davis' violent conduct. In addition, the Probation Memorandum, which was adopted by the sentencing judge, fully discussed the possible bases for an upward departure from Category III to each of Category IV, Category V, and Category VI.

Finally, counsel for Davis was provided with notice and an opportunity to challenge the upward departure from Criminal History Category III to Criminal History Category VI. The Probation Memorandum dis-

cussing the availability of such a departure was provided to Davis. In addition, during the January 1990 hearing, the court requested that Davis' counsel address "at least category V." After announcing his decision to apply Category VI, the district court again provided Davis' counsel an opportunity to address what sentence was appropriate. Thus, Davis was adequately provided with the procedural safeguards to which he is entitled.

## CONCLUSION

We have examined each of defendants-appellants' remaining arguments and find them to be without merit. In light of the foregoing, we affirm the judgments of the district court.