UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————

No. 93 - 1067

————————


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PHILIP SCOTT ASHBURN,

Defendant-Appellant.

————————


Appeal from the United States District Court
for the Northern District of Texas

————————

(    May 10, 1994    )


Before GOLDBERG, DAVIS, and DeMOSS, Circuit Judges.

GOLDBERG, Circuit Judge:

Philip Scott Ashburn appeals the sentence given him after he pleaded guilty to two counts of bank robbery in violation of 18 U.S.C. § 2113 (a).  At Ashburn's sentencing hearing, the district court adopted the Presentence Investigation Report's (PSI) calculation of the defendant's Guideline range under the Sentencing Guidelines.  The sentencing court overruled all but one of

Ashburn's objections to the report.[1]   The court then determined that the appropriate Guideline range for Ashburn's offense was 63 to 78 months.  However, because the sentencing judge believed the Guideline range insufficiently reflected Ashburn's criminal history and likelihood of recidivism, he upwardly departed, sentencing Ashburn to a term of 180 months.

Ashburn appeals the denial of his objections to the PSI and the upward departure.  Although the objections to the PSI are without merit, we find that the upward departure was not sufficiently justified and was based on improper considerations. We therefore vacate Ashburn's sentence and remand this case for resentencing pursuant to 18 U.S.C. § 3742 (f)(2)(A).

## I.  Background

Ashburn pleaded guilty to Counts 3 and 4 of a four count indictment that alleged that he participated in four separate Texas bank robberies.[2]   In return for the guilty plea, the government agreed to dismiss the other two counts.  Count 3 charged Ashburn with a bank robbery which occurred on July 3, 1992 in which $4,167 was stolen from the Bank of America in Fort Worth, Texas; Count 4 charged Ashburn with a robbery in which approximately $32,000 in cash was stolen from the American Bank of Hurst, Texas on July 31,

_____

[1] The only objection sustained by the district court was to allow an additional reduction in Ashburn's offense level for acceptance of responsibility.

[2] The indictment specifically charged Ashburn with violations of 18 U.S.C. § 2113 (a).

1992.

The PSI prepared prior to Ashburn's sentencing revealed that he had been convicted in 1984 of armed bank robbery. For this offense, Ashburn served a six year sentence in the custody of the Attorney General under the Federal Youth Corrections Act (YCA), formerly codified at 18 U.S.C. § 5010 (b). The PSI assessed three criminal history points against Ashburn for this prior conviction, producing a criminal history category of II. The PSI also increased Ashburn's offense level by two for the instant offenses because he made an express threat of death while committing the July 31 robbery. United States Sentencing Commission, Guidelines Manual (U.S.S.G.) § 2B3.1 (b)(2)(F).

The court granted Ashburn's request for a three level reduction in his offense level for acceptance of responsibility, U.S.S.G. § 3E1.1 (b)(2), instead of the two level reduction recommended by the PSI. The court then overruled all of Ashburn's other objections to the PSI. As a result, Ashburn's offense level was calculated at 25. When this figure was cross-referenced with his Criminal History Category of II, Ashburn's Guideline range was 63 to 78 months. The court, dissatisfied with this range, notified the parties of its provisional intention to upwardly depart from the Guideline calculation.

To support the upward departure, the government called Federal Bureau of Investigation (FBI) agent, Deborah Eckert, who testified at the sentencing hearing about her investigation into several robberies and attempted robberies for which Ashburn was alleged to

3

be responsible. Agent Eckert described an interview she conducted with Ashburn's co-defendant, April Jeanette English. In that interview, English asserted that Ashburn had admitted to her that he had committed two earlier robberies in December of 1991 and January of 1992. These two robberies, charged in counts 1 and 2 of Ashburn's indictment, were later dismissed under the plea agreement.

English also told Eckert that in April of 1992, she (English) received a call from Ashburn in which he stated he had committed a robbery in Florida. Eckert confirmed that a robbery had been reported in Key West, Florida on the specified day.[3] Eckert also testified about two additional attempted robberies in July of 1992 which Ashburn had related to English.[4]

The district court concluded that the Criminal History Category II did not adequately reflect the seriousness of Ashburn's past conduct or the likelihood that he would commit additional crimes. The judge therefore upwardly departed, sentencing Ashburn to serve concurrent 180 month terms of imprisonment on Counts 3 and 4. The court also sentenced Ashburn to a 3 year term of supervised release.

Ashburn contends that the district court erroneously calculated his offense level and Criminal History Category and made

---

[3] Ashburn was never charged with this robbery.

[4] Pursuant to the plea agreement, the government agreed not to prosecute Ashburn for these two attempts.

4

various errors in its decision to upwardly depart.

## II.  ANALYSIS

Ashburn makes two objections to the district court's calculation of the appropriate sentence range for his crimes.  His first argument regards the increase in his sentence for an express threat of death; the other concerns the inclusion of his YCA conviction in the determination of his Criminal History Category.  Ashburn also appeals the judge's decision to upwardly depart from the Guidelines range on the grounds that the judge failed to provide sufficient justification for the departure and because the departure was unsupported by proper evidence.  We will address each consideration in turn.

Prior to embarking upon the analysis of Ashburn's specific contentions, we note that "[o]ur review of a sentence under the guidelines is `confined to determining whether a sentence was imposed in violation of law or as a result of an incorrect application of the sentencing guidelines.'"  United States v. Shipley, 963 F.2d 56, 58 (5th Cir.), cert. denied, 113 S. Ct. 348, 121 L. Ed. 2d. 263 (1992) (quoting United States v. Nevarez-Arreola, 885 F.2d 243, 245 (5th Cir. 1989)) (internal quotations omitted); 18 U.S.C. § 3742 (e).  This court reviews the lower court's application of the Guidelines de novo and its findings of fact for clear error.  United States v. Brown, 7 F.3d 1155, 1159 (5th Cir. 1993).

A.  Express Threat of Death

5

The district court adopted the PSI's recommendation of a two point increase in Ashburn's offense level due to an express threat of death. U.S.S.G. § 2B3.1 (b)(2)(F).[5] While making his escape from the July 31 robbery, several bystanders observed Ashburn exit the bank. The observers gave chase. Ashburn stopped, turned toward these interlopers, and, holding his hand in his pocket to simulate the presence of a gun, shouted "Stop - I've got a gun and I will shoot you!" Ashburn then ran toward a car occupied by his co-defendant English, hopped in, and sped away.

The district court concluded that Ashburn's threatening remarks to the bystanders were sufficient to justify a two point increase in Ashburn's offense level. Ashburn contends that this increase was in error because the Commentary to § 2B3.1 establishes that the two level enhancement applies only when the threat is directed at the victim of the robbery. The threat of death in this case, contends Ashburn, was directed only at bystanders. Therefore, according to Ashburn's interpretation of the Commentary, the increase of two levels was improper.

The Supreme Court recently held that Commentary in the Sentencing Guidelines "that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 113 S. Ct. 1913, 1915, 123 L. Ed. 2d 598 (1993). Thus, we are bound to follow the

---

[5] Section 2B3.1 (b)(2)(F) specifies that, "if an express threat of death was made, increase by 2 levels."

6

Commentary unless it can be shown to be inconsistent with the Guidelines. In this case, because we find such an inconsistency, we are not constrained by the Commentary's interpretation of the Guidelines.

Ashburn relies on the Commentary to section 2B3.1 which explains the meaning of an "express threat of death". The Commentary states that the:

> court should consider that the intent of the underlying provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, significantly greater fear than that necessary to constitute an element of the offense of robbery.

U.S.S.G. § 2B3.1, note 6. According to Ashburn, this Application Note explains that the enhancement for a threat of death is directed at those offenders who menace <u>victims</u> with threats of death. He notes that the examples cited in this Application Note, "an oral or written demand using words such as `Give me the money or I will kill you,'" always combine the threat of death with the demand for money. In fact, the Application Note specifically links the threat of death with an element of the offense. Ashburn concludes that since escape is not an element of 18 U.S.C. § 2113, the district court incorrectly enhanced his sentence for threats of death.

If Ashburn is correct that a bystander cannot be a victim of a bank robbery under the Commentary, then an inconsistency exists between this Application Note and the section of the Guidelines on which it is based. In such circumstances, we follow the

Guidelines. Stinson, 113 S. Ct. at 1918 ("If, for example, commentary and the guideline it interprets are inconsistent in that following one will result in violating the dictates of the other, the Sentencing Reform Act itself commands compliance with the guideline. See 18 U.S.C. §§ 3553 (a)(4), (b).")

The applicable Guideline simply states that "if an express threat of death was made, increase by 2 levels." U.S.S.G. § 2B3.1 (b)(2)(F). This section is not limited to those threats made against the victims of the bank robbery, e.g., a teller. The Guideline does not exclude bystanders from its reach and to imply such an exclusion would contradict the language of the Guidelines. Thus, if the Commentary is properly construed by Ashburn, it does not carry the force of law.

This opinion, however, should not be interpreted to hold that any threat of death, whenever and to whomever made, suffices to enhance a defendant's sentence. The threat must occur as part of the commission of the bank robbery. However, as we show below, the crime of bank robbery is ongoing during the phase in which the defendant effects his escape. Thus, a sufficient nexus exists between Ashburn's threat of death to bystanders and his commission of the bank robbery for the two level enhancement under § 2B3.1 (b)(2)(F) to be proper in this case.

To determine whether a sufficient link exists between an express threat of death made to a bystander and the commission of the offense, we must delineate the boundaries of the crime. Specifically, the issue before us is whether Ashburn was still

8

committing a bank robbery when he threatened to shoot the bystanders. That is, we must ask whether Ashburn was in the process of robbing the bank, or escaping, or both, when he menaced the lives of these onlookers.

In <u>United States v. Bates</u>, 896 F.2d 912 (5th Cir.), <u>cert. denied</u>, 496 U.S. 929, 110 S. Ct. 2628, 110 L. Ed. 2d 648 (1990), this court held that in calculating a defendant's sentence, the "district court was entitled, if indeed not required, to consider conduct during flight in imposing sentence." <u>Id.</u> at 915. The court then upheld the trial court's upward departure in the defendant's sentence based on the mayhem committed during his escape from a bank robbery.

Similarly, in <u>United States v. Willis</u>, we ruled that although the crime of bank robbery does not require escape as an essential element, "the crime continues throughout the escape" for the purposes of determining the culpability of those who assist in the perpetration of the crime. 559 F.2d 443, 444 n.5 (5th Cir. 1977). The <u>Willis</u> court determined that "[t]he crime of larceny obviously continues as long as the asportation continues and the original asportation continues at least so long as the perpetrator of the crime indicates by his actions that he is dissatisfied with the location of the stolen goods . . ." <u>Id.</u> at 444; <u>see also United States v. Pate</u>, 932 F.2d 736, 738 (8th Cir. 1991) ("A bank robbery does not necessarily begin or end at the front doors of the bank."); <u>United States v. James</u>, 998 F.2d 74, 80 (2d Cir.), <u>cert. denied</u>, 114 S. Ct. 415, 126 L. Ed. 2d 362 (1993) (bank robbery

9

offense in 18 U.S.C. § 2113 (a) extends to the period of hot pursuit). The sum of these cases is that many courts, ours included, have found that the escape phase of the robbery can be considered part of the offense of bank robbery under various circumstances. We believe that the present situation is such a circumstance.

The Guidelines intended that any threat of death, if made during the commission of a bank robbery, would be sufficient for a two point increase in a defendant's offense level. The Guidelines were as concerned with the impact of death threats upon innocent passersby as upon bank employees. Therefore, we conclude that the trial court properly denied Ashburn's objections to the two level enhancement to his sentence for express threat of death.

B. Consideration of Youth Corrections Act Conviction for Criminal History Category

Ashburn contends that his 1984 bank robbery conviction is an "expunged" conviction that, pursuant to U.S.S.G. § 4A1.2(j) should not be included in his Criminal History Category. Section 5021 of the YCA provides:

> (a) Upon the unconditional discharge by the Commission of a committed youth offender before the expiration of the maximum sentence imposed upon him, the conviction shall be automatically set aside and the Commission shall issue to the youth offender a certificate to that effect.

18 U.S.C. 5021 (a) (1976) (emphasis added). The central question here is whether the "set aside" language in the YCA means that the conviction is "expunged" as that term is used in U.S.S.G. § 4A1.2 (j). Section 4A1.2 (j) provides that "[s]entences for expunged convictions are not counted" for purposes of calculating a

10

defendant's Criminal History Category.  The YCA conviction cannot be considered in calculating Ashburn's criminal history if by "set aside" in the YCA, Congress meant for the conviction to be "expunged."

Ashburn contends that we are bound by this court's decision in United States v. Arrington, 618 F.2d 1119 (5th Cir. 1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 876, 66 L. Ed. 2d 812, (1981). In that case we reversed the defendant's conviction for possession of a weapon by a felon because the prior conviction had been set aside under the YCA.  We stated that "[e]xpunction of Arrington's conviction was clearly automatic upon his unconditional discharge at the end of six years."  618 F.2d at 1124.  We held that "[i]f a youthful offender has been unconditionally discharged, the disabilities of a criminal conviction are completely and automatically removed; indeed, the conviction is set aside as if it had never been."  Id.[6]

Ashburn has overstated the reach of our holding in Arrington; therefore, we are not persuaded that his conviction was expunged for purposes of calculating his Criminal History Category.  In Arrington, we explicitly declined to delineate the contours of "expungement":  "We do not need to decide now if 18 U.S.C. § 5021

---

[6] Ashburn also relies on the Ninth Circuit's decision in United States v. Kammerdiener, 945 F.2d 300 (9th Cir. 1991) holding that YCA convictions which had been set aside under § 5021 could not be counted in a defendant's criminal history category.  The court in Kammerdiener relied in part on the circuit's prior decision in United States v. Hidalgo, 932 F.2d 805 (9th Cir. 1991) stating that "set aside" as defined in a California youthful offender statute amounted to an expungement under § 4A1.2 (j).

(a) (1976) also serves to expunge even the record of Arrington's previous conviction.  For the purposes of this appeal, defining expunction to include at least setting aside his conviction is a satisfactory resolution." 618 F.2d at 1124 n.8.

Congress' design in employing the term "set aside" cannot be easily determined.  We must determine whether in utilizing the "set aside" language in the YCA, Congress intended to eliminate all evidence of the conviction, i.e. through physical destruction of the record of conviction,[7] or whether Congress merely intended to eradicate certain legal consequences of that conviction.  If it is the latter, then we must ascertain whether in abolishing the legal consequences of a YCA conviction, Congress intended to also suspend the ability of a future court to consider that conviction in calculating a defendant's Criminal History Category.

Various courts have addressed whether the language in the YCA mandating an "automatic[] set aside" of a YCA conviction, 18 U.S.C. § 5021, requires actual destruction or elimination of the record of conviction.  Most have found that the YCA does not allow a court to authorize the actual physical obliteration of the record of conviction.  See United States v. Doe, 732 F.2d 229 (1st Cir. 1984); United States v. Doe, 556 F.2d 391 (6th Cir. 1977); United States v. McMains, 540 F.2d 387 (8th Cir. 1976); but see United

---

[7] We note the Tenth Circuits definition of expunction as follows:  "[w]ith respect to criminal records, expunction refers to the process of sealing or destroying the record of a criminal conviction after expiration of a certain time."  United States v. Johnson, 941 F.2d 1102, 1111 (10th Cir. 1991) (citing Black's Law Dictionary at 522 (5th ed. 1979)).

12

States v. Doe, 980 F.2d 876 (3d Cir. 1992).  These cases generally hold that if Congress meant to "expunge" the records in the sense of making them wholly unavailable through segregation and seal or through complete destruction, it would have so specified in the statute.  See, e.g., Doe, 732 F.2d at 230 (1st Cir.) (district court correctly refused to order records destroyed because "we do not see how this relief can be granted without rewriting the statute, since the statute makes no reference to arrest records.")

In addition, these courts reasoned that because the arrest records of those who are acquitted or not prosecuted at all remain in the general police files, "[t]o destroy or segregate the present arrest records would leave a convicted person with a cleaner slate than an arrestee who was never found guilty."  Id.  Finally, the First Circuit looked to the legislative history of the YCA and found nothing to support the conclusion that Congress intended to allow an expungement of the actual records of a YCA conviction.  Id.; contra Doe, 980 F.2d at 879-82 (3d Cir.) (history of act indicates drafters wanted youthful offenders who served their time and rehabilitated themselves to have the stigma wiped out).  With the exception of the Third Circuit's recent Doe decision, our sister circuits have generally agreed that the "set aside" provision in § 5021 (a) is not an expungement in the sense of obliterating or even segregating and sealing the records of conviction.

Similarly, we decide today that the "set aside" provision should not be interpreted to be an expungement under § 4A1.2 (j) in

calculating a defendant's criminal history category. The Commentary to § 4A1.2 (j) explains that convictions which are set aside for "reasons unrelated to innocence or errors of law, e.g., in order to restore civil rights or to remove the stigma associated with a criminal conviction" are not expunged for purposes of this Guideline and can be included in Criminal History Category determinations. Because the YCA conviction here was set aside for "reasons unrelated to innocence or errors of law," it was properly utilized in the criminal history calculation.

The legislative history of section 5021 supports our analysis. The amendment's sponsor, Senator Dodd, testified that section 5021:

> provides an additional incentive for maintaining good behavior by holding out to the youth an opportunity to clear his record . . . For those who demonstrate a willingness to help themselves, every reasonable opportunity is afforded to assist them in making a new start.

107 Cong.Rec. 8709 (1961). The YCA was designed to give the young defendant a new lease on life. Congress determined that a spontaneous, youthful transgression should not inhibit a person's evolution into productive citizenship. However, this beneficent offer of a "second chance" to the immature offender should not be available as a shield for those whose original encounter with the criminal world is used as a springboard to a life of felonious conduct. We agree with the rationale of the D.C. Circuit that "[i]f a juvenile offender turns into a recidivist, the case for conferring the benefit dissipates. Society's stronger interest is in punishing appropriately an unrepentant criminal." United States v. McDonald, 991 F.2d 866, 872 (D.C.Cir. 1993) (quoting Barnes v.

14

_United States_, 529 A.2d 284, 286-89 (D.C. 1987)) (citations omitted). The YCA was not intended to allow a person convicted under its auspices to rewrite his life when his handwriting shows that post-conviction activities are criminal in nature.

In sum, the YCA conviction, which under section 5021 (a) is automatically "set aside" upon release of the defendant, should not be considered expunged for purposes of calculating the defendant's Criminal History Category. Although the language of section 5021 is not as clear as it should be, we believe that Congress did not intend that it be used to protect the recidivist from the full consequences of his actions. The district court, therefore, acted properly in considering this conviction.

C. Upward Departure

Ashburn complains that the district court improperly imposed an upward departure pursuant to U.S.S.G. § 4A1.3. He argues that the departure from a Guideline range of 63-78 months to a sentence of 180 months was excessive and unjustified and based on conduct dismissed pursuant to a plea bargain or not established by sufficient evidence.

A district court may upwardly depart from the Sentencing Guidelines if the court finds that an aggravating circumstance exists that was not adequately taken into consideration by the Sentencing Commission. 18 U.S.C. § 3553 (b). Whenever a defendant is sentenced, the district judge is required to "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553 (c). If the court upwardly departs from the

15

Guidelines, the court must also state "the specific reason for the imposition of the sentence different from that described."  Id.

We review the district court's decision to upwardly depart for abuse of discretion.  United States v. McKenzie, 991 F.2d 203, 204 (5th Cir. 1993).  We will affirm a departure from the Guidelines "if the district court offers `acceptable reasons' for the departure and the departure is `reasonable.'"  United States v. Lambert, 984 F.2d 658, 663 (5th Cir. 1993) (en banc) (quoting United States v. Velasquez-Mercado, 872 F.2d 632, 637 (5th Cir. 1989)).  Under U.S.S.G. § 4A1.3, an upward departure "is warranted when the Criminal History Category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes."

1.  Adequacy of Departure Justification

We have previously outlined the procedure for making an upward departure where the defendant's Criminal History Category is inadequate.  Lambert, 984 F.2d at 662-63.  To upwardly depart under U.S.S.G. § 4A1.3, district courts must first consider adjusting the defendant's Criminal History Category to the next higher category.  Id. at 661.  The sentencing court must then evaluate each successive Criminal History Category above the appropriate Guideline range.  U.S.S.G. § 4A1.3.  In Lambert, we explained:

> the district court should consider each intermediate criminal history category before arriving at the sentence it settles upon; indeed, the court should state for the record that it has considered each intermediate adjustment. Further, it should explain why the criminal history category as calculated under the guidelines is inappropriate and why the category it chooses is appropriate.

16

984 F.2d at 662-63. However, recognizing the complexities inherent in setting a sentence appropriate to every defendant, "we do not . . . require the district court to go through a ritualistic exercise in which it mechanically discusses each criminal history category it rejects en route to the category that it selects." Id. at 663.

Before we progress any further in our analysis, we will set out the reasons advanced by the sentencing court in justifying an upward departure in this case. The judge determined that had the robbery offenses committed in December of 1991, January of 1992[8], and April 1992[9] been considered in his Criminal History Category, Ashburn would have received nine extra criminal history points. Under the court's calculations, Ashburn would then have a total of twelve criminal history points and a corresponding Criminal History Category of V. When considered with an Ashburn's offense level of 25, the judge figured that Ashburn was facing a Guideline range of 100 to 125 months.

The court then cited the 1984 YCA convictions and concluded that "if they were to be taken into account, the Criminal History Category VI would not be sufficient to take into account his past criminal conduct." The court at this time referenced various attempted robberies which Ashburn's co-defendant had imputed to him. The court stated that given the "likelihood the defendant

---

[8] The December 1991 and January 1992 robberies had been Counts 1 and 2 of the indictment and were dismissed pursuant to the plea bargain.

[9] Ashburn was never indicted on the allegations of the April 1992 bank robbery.

17

will commit other crimes . . . as well as the seriousness of his past criminal conduct" the court would impose a "rather drastic upward departure from what the guideline range contemplates." The judge then fixed a sentence of 180 months, found by indexing the Criminal History Category of VI with an offense level of 29.

The sentencing judge, in sum, did provide some substantive explanation for his decision to upwardly depart. However, the sentence actually given was 230 per cent of the maximum Guideline range. The court, therefore, should have given a detailed accounting of how it reached this rather severe enhancement. In Lambert, we explained that "[i]n a very narrow class of cases, we can conceive that the district court's departure will be so great that, in order to survive our review, it will need to explain in careful detail why lesser adjustments in the defendant's criminal history score would be inadequate." 984 F.2d at 663. The instant case is the sort of drastic departure that the Lambert court had in mind in this passage.

The sentencing judge failed to make explicit the bulk of the reasoning behind his decision to depart. Additionally, the judge did not justify the overall magnitude of the upward departure. We are therefore compelled to vacate the sentence and remand this case to the district court for resentencing.

To begin with, the sentencing judge failed to indicate why the Criminal History categories of III and IV should be bypassed. He merely assessed the unindicted and dismissed robberies as prior sentences under the Criminal History Category. The court failed to

18

indicate why it thought such a calculation, contrary to the requirements of the Guidelines, was necessary.[10]   The judge also failed to indicate why he believed the Criminal History Category V was inadequate and why the jump to VI was required.

The judge's reference to Ashburn's previous YCA convictions in upwardly departing is also insufficient as a justification for the upward departure since this conduct had already been considered in the calculation of the Criminal History Category.  To avoid double counting, it is necessary for the court to demonstrate why the Criminal History Category calculation inadequately reflected the seriousness of Ashburn's crime.  Without more detailed explanation, the district court should not have included this prior sentence in its consideration.

In addition, the lower court did not indicate why even Criminal History Category VI was inadequate, thereby justifying an increase in the offense level from 25 to 29 in the final sentence.[11] Such a radical departure from the requirements of the Guidelines cannot be justified by simple recitation of the language of § 4A1.3 that the Criminal History Category failed to reflect the probability of recidivism and the wrongfulness of the defendant's

---

[10] The Guidelines include only prior sentences, not prior offenses or prior conduct, in calculating the Criminal History Category.  U.S.S.G. § 4A1.1.

[11] The Guidelines themselves explicitly state that a departure beyond Criminal History Category VI is for the "case of an egregious, serious criminal record in which even the guideline range for Criminal History Category VI is not adequate to reflect the seriousness of the defendant's criminal history."  U.S.S.G. 4A1.3 (policy statement).

19

prior acts.[12]  Mouthing of the court's authority under § 4A1.3 to depart where the criminal history category "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes" does not meet the sentencing court's burden of adequately justifying an upward departure.  Recidivism and seriousness are not magic words which by their mere utterance empower the judge to depart from the Guidelines.

Our <u>Lambert</u> decision requires a judge departing from the guidelines to make various showings.  First, the sentencing court must indicate that he or she has considered the intermediate categories.  <u>Lambert</u>, 984 F.2d at 662.  This was partially accomplished in this case.  However, given the large number of categories skipped, a more detailed consideration of intervening categories should have been given.  Second, the sentencing judge is required to show why the Criminal History Category as calculated under the guidelines is inadequate.  <u>Id.</u>  The sentencing judge in the instant case failed to comply with this requirement.  Although he reiterated his belief that the Criminal History Category was inadequate, he failed to provide any illumination as to why this was so.  Third, the court must show why the sentence it settles upon is appropriate.  <u>Id.</u> at 663.  This was nowhere accomplished by the judge sentencing Ashburn.  Finally, the sentencing judge should

_____

[12] The Second Circuit has held that an upward departure beyond criminal history category VI would be justified under "only the most compelling circumstances--for example, prior misconduct accompanied by wanton cruelty. . ." <u>United States v. Cervantes</u>, 878 F.2d 50, 55 (2d Cir. 1989).

20

make sufficient reference to the factual record in justifying the departure. In this case, more detailed references to the record were essential, especially since the judge made an upward departure of nine years over the top of the applicable Guideline range. Lambert's words are not empty slogans. The type of departure imposed in this case calls for strict adherence to its commands.

The sentencing court, in addition to justifying the particular steps of the upward departure, should be able to justify the overall magnitude of that departure. As the Tenth Circuit stated, "[b]ecause a judge who departs no longer strictly follows the standards of the Guidelines, uniformity is threatened. The relative lack of constraint accompanying departures also threatens the principle of proportionality." United States v. Jackson, 921 F.2d 985, 988 (10th Cir. 1990). The exercise of restraint and moderateness in the situation of departures is therefore of great importance.

There has been much written about the Sentencing Guidelines and all of its appendices and commentaries. Some doubt has arisen as to their effectiveness in controlling crime and in their capacity for equalizing sentences based on actual criminal activities. Suffice it to say that requiring specificity in the reasoning of district judges will assure that appellate courts fulfill their role as intelligent overseers capable of carrying out the lofty intentions that animate the Guidelines.

Because the court did not adequately comply with 18 U.S.C. § 3553 (c) in explaining the reasons for the upward departure, we are

21

compelled to set aside Ashburn's sentence and to remand the case for resentencing and for more detailed explication of any upward departure the court finds appropriate.

2.  Consideration of Prior Conduct in Upward Departure

Ashburn raises three additional concerns about the three prior robberies that the court considered in making the upward departure. We address each argument in turn.

a.  Contemporaneous crimes

Ashburn first complains that the court should not have considered the robberies because they were contemporaneous with the counts upon which he was sentenced.  In United States v. Coe, 891 F.2d 405 (2d Cir. 1989), the Second Circuit determined that "where a defendant commits a series of similar crimes, it would be elevating form over substance to regard the early episodes in the series as `prior criminal history' simply because the defendant pled guilty to the last in the series, rather than the first."  Id. at 409-10.  However, the prior acts considered by the district court in the instant case occurred seven, six and three months prior to the offenses upon which Ashburn pleaded guilty.  His situation is therefore not analogous to the contemporaneous crime spree faced by the court in Coe in which all the offenses occurred within two weeks of each other.  Thus, we find no merit in Ashburn's argument that the sentencing court improperly considered contemporaneous acts in its decision to upwardly depart based on the inadequacy of the Criminal History Category.

b.  Dismissed Offenses

Ashburn also contends that the sentencing court improperly considered the December 1991 and January 1992 robberies as a basis for upward departure because this conduct formed the basis for the counts of Ashburn's indictment which were dismissed pursuant to his plea bargain.  We agree.  Counts which have been dismissed pursuant to a plea bargain should not be considered in effecting an upward departure.  <u>United States v. Fine</u>, 975 F.2d 596, 602 (9th Cir. 1992) (en banc); <u>United States v. Castro-Cervantes</u>, 927 F.2d 1079 (9th Cir. 1990).

To allow consideration of dismissed counts in an upward departure eviscerates the plea bargain.  Such consideration allows the prosecutor to drop charges against a defendant in return for a guilty plea and then turn around and seek a sentence enhancement against that defendant for the very same charges in the sentencing hearing.  <u>Cf.</u> <u>United States v. Thomas</u>, 961 F.2d 1110, 1121 (3d Cir. 1992) (government should not be allowed to bring dismissed charges "through the `back door' in the sentencing phase, when it had previously chosen not to bring it through the `front door' in the charging phase.")

Prior to the enactment of the Guidelines, no limits were placed on the information a sentencing court could consider in fashioning a sentence.  The federal courts utilized a real-offense sentencing approach in which the sentencing judge could consider any conduct by the defendant whatsoever in setting a sentence, including all offenses committed by the defendant whether dismissed, unindicted, or the basis of an earlier conviction.

23

Appellate review under this system was, as a result, dramatically circumscribed. The legislative history of the Sentencing Guidelines indicates that the absence of appellate review in pre-Guidelines cases was a result of the fact that "sentencing judges have traditionally had almost absolute discretion to impose any sentence legally available in a particular case." S. Rep. No. 225, 98th Cong., 1st Sess. 149, 150 (1983) reprinted in 1984 U.S.C.C.A.N. 3332.

The Guidelines were enacted to bring uniformity and predictability to sentencing. The Sentencing Guidelines "are intended to afford enough guidance and control of the exercise of [the district court's] discretion to promote fairness and rationality, and to reduce unwarranted disparity, in sentencing." Id. Appellate review of sentences to effectuate the desired uniformity and predictability is essential to the structure of the Guidelines. Id. This rationalized sentencing approach included a modification of the real-offense sentencing program aimed at limiting the information a sentencing court could take into account in setting a defendant's sentence. U.S.S.G. § 1B1.3, note 8; see also Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 11 (1988) ("A sentencing guideline system must have some real elements, but not so many that it becomes unwieldy or procedurally unfair. The Commission's system makes such a compromise.").

In modifying the real-offense approach, the Sentencing Commission refused to adopt a pure charge-offense approach in which

only the conduct actually charged could be considered in sentencing. It instead limited in specific ways the information the sentencing judge could consider in setting a sentence. See United States v. Kim, 896 F.2d 678, 682-3 (2nd Cir. 1990) (setting out the four ways in which acts of misconduct other than the offense of conviction could be considered by a sentencing court). The Commission delineated the particular information which it found relevant and appropriate for consideration in setting a sentence and left to the appellate courts the role of enforcing those limits.

In sum, preservation of limits on what sentencing courts can consider by way of sentencing is an essential part of the structure of the Guidelines. We find that consideration of dismissed offenses as a basis for an upward departure under § 4A1.3 is a breach of that structure. We adopt the reasoning outlined by the Ninth Circuit that a sentencing court should not be allowed to violate the bargain worked out between the defendant and the government. Castro-Cervantes, 927 F.2d at 1082; United States v. Saldana, 12 F.3d 160, 163 (9th Cir. 1993); see also United States v. Ruffin, 997 F.2d 343, 346 (7th Cir. 1993) (allowing consideration of offenses dismissed pursuant to plea bargains prior to the presently charged offenses, distinguishing Castro-Cervantes on the grounds that it "holds no more than that a defendant who pleads guilty receives the Guideline sentence for the crime to which he pleaded."); but see United States v. Zamarripa, 905 F.2d 337, 341 (10th Cir. 1990) (when a defendant pleads to one in a

series of offenses, some of which are dismissed, an upward departure is allowable based on the dismissed counts.).

The Ninth Circuit has stated that allowing consideration of dismissed counts in sentencing "would undermine the integrity of the plea bargaining system [and] . . . would severely undermine the incentive of defendants to enter into plea bargains." United States v. Faulkner, 952 F.2d 1066, 1070 (9th Cir. 1991). Given that close to eighty five percent of federal convictions are plea bargained, the integrity of this system is vital to our national system of criminal justice. See United States Sentencing Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements, at 48 n.80 (1987).

Just as civil society depends upon the judicial enforcement of private contracts between individuals, the institutions of criminal justice depend on the fair and equitable enforcement of plea bargains. We should not tamper with this system by allowing the government to violate its bargain and the whole plea bargain process and bring dismissed offenses back in for the purposes of upward departures under § 4A1.3.

The sentencing court has the power to reject a plea agreement if it does not "adequately reflect the seriousness of the actual offense behavior." U.S.S.G. § 6B1.2 (policy statement). Having accepted the agreement, however, the court should not allow the government to violate "the spirit if not the letter of the bargain" by considering the dismissed offenses as a basis for an upward departure. Castro-Cervantes, 927 F.2d at 1082.

26

The government asserts that a 1992 amendment to the Guidelines contradicts our argument. The Sentencing Commission altered U.S.S.G. § 6B1.2 to provide that if a plea agreement includes a dismissal of charges, the agreement, "shall not preclude the conduct underlying such charge from being considered under the provisions of § 1B1.3 (Relevant Conduct) in connection with the count(s) of which the defendant is convicted." This amendment, the government argues, provides a basis for considering the conduct of the defendant even if dismissed pursuant to a plea agreement.

The difficulty with the government's position is that in this case, the dismissed counts were <u>not</u> counted as relevant conduct in setting Ashburn's offense level.[13] The sentencing court instead considered the dismissed counts in making an upward departure based on the inadequacy of the defendant's Criminal History Category. The Ninth Circuit has observed precisely this distinction, allowing consideration of dismissed counts in the case of relevant conduct, but not for upward departures pursuant to § 4A1.3. <u>See</u> <u>Fine</u>, 975 F.2d at 602-03. In <u>United States v. McAninch</u>, 994 F.2d 1380 (9th Cir.), <u>cert. denied</u>, 114 S. Ct. 394, 126 L. Ed. 2d 342 (1993), the court found that dismissed counts could be considered as relevant conduct pursuant to section 1B1.3 (a)(2). However, the court was careful to distinguish and reaffirm the court's "previous holding in [<u>Castro-Cervantes</u>] that a court may not <u>depart upward</u> from the

---

[13] Ashburn was convicted of bank robbery, which under the guidelines is a non-groupable offense. Thus, the dismissed counts could not be considered within the relevant conduct of U.S.S.G. § 1B1.3 (a)(2).

guidelines sentence on the basis of dismissed charges." 994 F.2d at 1383 (emphasis in original).

The reasoning put forward by the Fine court bears repeating:

A person who pleads guilty under the sentencing guidelines may be entitled to expect that he will receive the guidelines sentence, not a sentence which departs upward. The guidelines put a cap on his exposure, usually well below the statutory maximum.

975 F.2d at 602. By contrast, where the sentencing court considers the dismissed counts as relevant conduct, for example by grouping stipulated amounts of drugs which had been the subject of counts dismissed pursuant to a plea bargain, Fine states that "[t]he reasonable expectation . . . of a sentence in accord with the guidelines, was honored by the sentence imposed on [the defendant]." Id.

Consideration of dismissed counts as relevant conduct is explicitly allowed by the guidelines. However, the bar to considering dismissed counts in making upward departures remains an important limitation in the modified real-offense sentencing approach of our current sentencing program. Allowing consideration of dismissed offenses would bring us much closer to the type of pure real-offense sentencing system explicitly rejected by the Guidelines. Such upward departures also contradict the Commission's commitment to maintaining uniformity and fairness in sentencing by significantly expanding the bases for making acceptable upward departures. S. Rep. No. 225, 98th Cong., 1st Sess. at 150 reprinted in 1984 U.S.C.C.A.N. at 3333. We think that the overall ends of the Sentencing Guidelines are best served by a

rule which prevents the government, and the sentencing judge, from considering counts dismissed pursuant to a plea bargain in requesting or carrying out an upward departure under § 4A1.3.

c.  Unreliability of Evidence of Prior Conduct

Ashburn raises a final contention regarding the propriety of his upward departure.  He claims that the upward departure is based on unreliable information and therefore cannot be considered under § 4A1.3.  Ashburn contends that the only evidence connecting him to the offenses considered in the upward departure was the unsworn accusations of his co-defendant, English.  Unsworn assertions generally "do not bear `sufficient indicia of reliability  to support [their] probable accuracy', and, therefore, should not generally be considered by the trial court in making its factual findings."  United States v. Alfaro, 919 F.2d 962, 966 (5th Cir. 1990) (quoting U.S.S.G. § 6A1.3 (a)).

However, a district court has wide discretion in evaluating the reliability of the information presented before it and making the determination as to whether or not to consider it.  United States v. Kinder, 946 F.2d 362, 366 (5th Cir. 1991), cert. denied, 112 S. Ct. 1677, 118 L. Ed. 2d 394 (1992).  The district court need only determine its factual findings by a "preponderance of the relevant and sufficiently reliable evidence." Alfaro, 919 F.2d at 965.[14]  The defendant bears the burden of proving that the evidence

---

[14] In Alfaro, we denied a defendant's challenge to the sentencing court's factual findings where the defendant "did not request an evidentiary hearing on the issue, nor did he submit affidavits or other sworn testimony to rebut the evidence contained in the officer's affidavit and the presentence report."

29

used against him in sentencing is "materially untrue, inaccurate or unreliable." United States v. Angulo, 927 F.2d 202, 204 (5th Cir. 1991). "Specific factual findings . . . are reviewed on appeal only for clear error." Id. at 205.[15]

Given our holding with regard to dismissed counts, the December 1991 and January 1992 offenses are unavailable for consideration in making an upward departure. However, the allegations of Ashburn's participation in the bank robbery in Florida as well as the attempted robberies remain available for evaluation in assessing the adequacy of the Criminal History Category.

The district court should nevertheless consider the defendant's objections to these factual findings in light of the longstanding suspicion and presumptive unreliability of unsworn statements of co-defendants. In United States v. Flores, we held that confessions of co-defendants are "presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." 985 F.2d 770, 776 (5th Cir. 1993) (quoting Lee v. Illinois, 476 U.S. 430, 545, 106 S. Ct. 2056, 2064, 90 L. Ed. 2d 514 (1986)). Because we have set aside the prior

---

919 F.2d at 966.

[15] We note that Ashburn has failed show that the statements made by English were untrue. However, because English herself did not testify, no cross-examination of her testimony was possible.

sentence, the court on remand can evaluate in light of these precedents whether, under the circumstances of the co-defendant's testimony through the FBI agent, sufficient evidence exists to support a factual finding as to these previous robberies.

III. Conclusion.

This opinion discusses a number of elements of the guidelines and its many satellitic disquisitions. We affirm the holding of the lower court with regard to the two level enhancement for express threat of death as we see no reason to artificially limit the commission of the defendant's crime to the moments when he is actually in the bank. Next, because Congress did not provide the "set aside" provisions of the YCA for use as a protective shield in carrying out a life of crime, Ashburn's prior YCA convictions were properly counted in calculating his criminal history category.

There are two final holdings. First, we find that a sentencing court has an obligation to explain the factual or legal justifications for making a guideline departure from 78 to 180 months. It does not take any stretch of the imagination to determine that this is a significant, if not radical departure, and we impose a legal requirement that the departing judge provide a legal explanation for that diversion. Second, we hold that it is only under unusual circumstances that counts dismissed pursuant to a plea agreement can be brought again into the foreground for punishment. We cannot allow one party to forsake a plea agreement to which the other party has remained faithful.

31

The sentence set by the lower court is therefore VACATED and this case is REMANDED for resentencing in accordance with this opinion.


DAVIS, Circuit Judge, concurring in part, dissenting in part:

I totally agree with the majority that this case should be remanded so the district court can give further consideration to its sentence. Unlike the majority, on remand I would not foreclose the district court from considering in the upward departure calculus the prior bank robberies the defendant was charged with committing in Counts 1 and 2 of this indictment.

As the majority opinion reflects, the circuits are split over this question. The majority relies on the opinions of the Ninth and Third Circuits.[16] These cases hold, as do the majority, that the defendant does not get the benefit of his plea bargain when the district court upwardly departs based on the dismissed counts of the indictment. I agree with the Second and Tenth Circuits[17] that no reasonable basis exists for a defendant who enters a guilty plea to believe that the court cannot use the prior criminal conduct from the dismissed counts of the indictment to enhance his sentence. Ashburn's plea bargain had no language that could have

---

[16] **United States v. Fine**, 975 F.2d 596, 602 (9th Cir. 1992) (en banc); **United States v. Castro-Cervantes**, 927 F.2d 1079 (9th Cir. 1990); **United States v. Thomas**, 961 F.2d 1110, 1121 (3d Cir. 1992).

[17] **United States v. Kim**, 896 F.2d 678 (2d Cir. 1990); **United States v. Zamarripa**, (10th Cir. 1990).

led him to that conclusion. It provided that the government would dismiss two of the counts and the government fully complied with that obligation.

I also find nothing in the guidelines themselves that would lead a defendant to reasonably expect that the conduct underlying the dismissed counts could not be used to enhance his sentence. The general guideline authorizing departure, § 5K2.0 does so in very broad terms. It authorizes the court to impose a sentence outside the guideline range if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. . . ." More specifically, 4A1.3 authorizes a court to depart "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, . . .."

In deciding whether to depart because of the defendant's criminal history, subsection (e) expressly authorizes the court to consider "prior similar adult criminal conduct not resulting in a criminal conviction." Neither this guideline nor its commentary suggests that an exception exists for prior similar criminal conduct that is the subject of dismissed counts of an indictment.

Because nothing in the plea agreement or the guidelines prevents the district court from considering the criminal acts underlying the dismissed counts, I would not require the district

judge to close his eyes to this conduct.