UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-1473

UNITED STATES,

Appellee,

v.

MICHAEL P. FOSHER,

Defendant - Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge] 



Before

Torruella, Chief Judge, 

Cyr, Senior Circuit Judge, 

and Stahl, Circuit Judge. 



George F. Gormley, by appointment of the court, with whom 
John D. Colucci and Gormley & Colucci, P.C. were on brief for 
appellant.
Alexandra Leake, Assistant United States Attorney, with whom 
Donald K. Stern, United States Attorney, was on brief for 
appellee.



August 27, 1997


TORRUELLA, Chief Judge. On July 6, 1995, Defendant- TORRUELLA, Chief Judge. 

Appellant Michael P. Fosher ("Fosher") pled guilty to four counts

of an indictment, which charged him with racketeering conspiracy,

in violation of 18 U.S.C. 1962(d), racketeering, in violation

of 18 U.S.C. 1962(c), interstate transportation of stolen

property, in violation of 18 U.S.C. 2314, and conspiracy, in

violation of 18 U.S.C. 371. On March 5, 1996, the sentencing

court imposed upward adjustments for an unusually vulnerable

victim and for Fosher's role in the offense. The court further

determined that Fosher's armed bank robbery conviction under the

Federal Youth Corrections Act, 18 U.S.C. 5005 et seq. ("FYCA"), 

previously set aside pursuant to that Act, was properly included

in the Criminal History Category calculation. The district court

calculated Fosher's Total Offense Level at 33 and his Criminal

History Category at III, resulting in a guideline sentencing

range of 168 to 210 months. The government requested that, in

light of Fosher's substantial assistance, the court grant a

downward departure under 5K1.1 and impose a 60 month sentence.

The court granted the government's downward departure motion, and

sentenced Fosher to 78 months' imprisonment. Fosher appeals his

sentence, arguing that the district court erred in its rulings

regarding the unusually vulnerable victim and the role in the

offense adjustments, as well as its inclusion in Fosher's

Criminal History Category of his set-aside conviction under the

FYCA. For the reasons set forth herein, we reverse and remand in

part and affirm in part.

-2-

BACKGROUND BACKGROUND

In presenting the facts, we consult the uncontested

portions of the Presentence Report ("PSR"), as well as the

sentencing hearing transcript. United States v. Lagasse, 87 F.3d 

18, 20 (1st Cir. 1996).

In December 1991, Fosher called Michael Chinn ("Chinn")

from Florida and told Chinn that he would pay Chinn's airfare to

Florida so that they could do "something big." Chinn flew to

Fort Lauderdale with Anthony Corso ("Corso"). The airline

tickets for both were purchased by Fosher. Chinn stayed with

Fosher, while Corso stayed with his father, Philip Corso. Upon

arrival in Fort Lauderdale, Chinn and Corso were taken by a

friend of Philip Corso to a restaurant to meet Fosher and Joe

Bomengo ("Bomengo"). During lunch, Fosher told them about a

house he had targeted for a home invasion. Donald Marks Schoff

("Schoff") had told Fosher that the house contained $500,000 in

gold coins and a five carat diamond ring and was occupied by a 62

year old woman, her daughter and granddaughter. Fosher stated

that he wanted Chinn and Corso to enter the house, while he

waited outside in a van and Schoff waited at the end of the

street listening to a police scanner. They also discussed using

weapons and Fosher unsuccessfully sought weapons from an

acquaintance he ran into in the restaurant.

Thereafter, Fosher, Chinn, Corso, Bomengo, and Schoff

met Philip Corso at Corso's house. Schoff described where the

-3-

money was kept. The participants looked at some guns at Philip

Corso's house and wanted to borrow the guns. Philip Corso

declined to let the group use the guns because the guns "were

hardly needed since the victim was an older woman." At the

meeting, Bomengo suggested that the participants pose as florist

delivery men. Fosher determined that he would rent a white

minivan to resemble a florist delivery truck. During the

discussion, Fosher made decisions and assigned roles to the

participants.

On the morning of January 8, 1992, Fosher, Chinn,

Corso, and Schoff executed the home invasion. Fosher, Chinn, and

Corso drove to the victim's house in the van, while Schoff

followed in a second car. On the way to the victim's house, they

purchased a floral arrangement and gloves and "ties" to bind the

victims. Corso and Chinn went to the front door with the

flowers. When the victim came to the door, they entered. Corso

asked her for the keys to the floor safe in the garage and

attempted to open it. Fosher and Schoff entered the garage to

help him. Upon opening the safe, they discovered only $500,000

worth of gold coins. They approached the victim and asked her

where the other safe and the five carat diamond ring were. The

men took the victim to her jewelry lockbox and took jewelry

valued at $23,000. When they were unable to find a five carat

diamond, Fosher told Chinn, within the hearing of the victim, "if

she doesn't tell you where the other safe is, shoot her." Chinn

told the victim that he would not let them hurt her.

-4-

When they left the victim's house, the four went to

Fosher's condominium, where they divided the coins. Fosher made

Corso throw away the jewelry for fear that it might allow someone

to identify them. Corso left Florida soon thereafter, taking

$80,000 in coins with him to Massachusetts. Chinn also returned

to Massachusetts, carrying cash received from Fosher after the

coins had been melted down.

On May 11, 1995, a federal grand jury returned a five

count indictment against Fosher and Corso. On June 27, 1995,

Fosher executed a plea and cooperation agreement with the United

States Attorney's Office, agreeing to plead guilty to four counts

of the indictment.1 The agreement provided that, at sentencing,

the government would take the position under the United States

Sentencing Guidelines ("U.S.S.G.") that Fosher's offense level

was 33, for which the guideline sentencing range was 135 to 168

months. The agreement noted that Fosher objected to this

calculation and reserved the right to argue for a lower offense

level. Fosher agreed to cooperate with the government and,

assuming he provided substantial assistance, the U.S. Attorney

agreed to file a motion for a two level downward adjustment under

U.S.S.G. 5K1.1.

On July 6, 1995, Fosher pled guilty to Counts One

through Four. At his March 5, 1996, sentencing hearing, the

probation department presented its PSR, in which the department

 

1 The United States Attorney's Office agreed to dismissed the
fifth count.

-5-

concluded that the four counts constituted seven groups of

offenses. The probation department calculated the Adjusted

Offense Level for each group and determined that the group

relating to an invasion and robbery, executed by Fosher and

others, of the home of a 62 year old Fort Lauderdale woman had

the highest Adjusted Offense Level at 33. This included a two-

level upward adjustment for an unusually vulnerable victim under

U.S.S.G. 3A1.12 and a four-level upward adjustment for being a

leader or organizer of five or more participants under U.S.S.G. 

3B1.1.3 After applying the grouping rules under U.S.S.G. 3D1.4

and providing for a downward adjustment for acceptance of

responsibility, the probation department concluded that Fosher's

Total Offense Level was 33.

The probation department concluded that Fosher's

Criminal History Category was III, including in the calculation a

conviction for armed bank robbery under the FYCA.

 

2 Section 3A1.1(b) provides in relevant part:

If the defendant knew or should have known
that a victim of the offense was unusually
vulnerable due to age, physical or mental
condition, . . . increase by 2 levels.

3 Section 3B1.1(a) provides in relevant part:

Based on the defendant's role in the offense,
increase the offense level as follows:

(a) If the defendant was an organizer
or leader of a criminal activity
that involved five or more
participants or was otherwise
extensive, increase by 4 levels.

-6-

On February 26, 1996, Fosher filed objections to the

upward adjustments in calculation of the offense level for the

Fort Lauderdale home invasion and to the inclusion of his FYCA

conviction in the Criminal History Category calculation. He

argued that the FYCA conviction should not be considered because

it had been "set aside" pursuant to the FYCA on September 24,

1982.

At the sentencing hearing, the district court agreed

with the findings in the PSR and imposed upward adjustments for

an unusually vulnerable victim and for Fosher's role in the

offense. The court further determined that Fosher's FYCA

conviction was properly included in the Criminal History Category

calculation. The district court, therefore, set Fosher's Total

Offense Level at 33 and his Criminal History Category at III,

resulting in a guideline sentencing range of 168 to 210 months.

The government submitted a motion requesting that, in light of

Fosher's substantial assistance, the court grant a downward

departure and impose a 60-month sentence. The court allowed the

government's 5K1.1 downward departure motion, but sentenced

Fosher to 78 months' imprisonment.

DISCUSSION DISCUSSION

I. Unusually vulnerable victim I. Unusually vulnerable victim

The government insists that the issue of whether the

victim of the Fort Lauderdale home invasion was "unusually

vulnerable" is a factual issue and therefore that the clear error

standard applies. Fosher argues vigorously that the facts being

-7-

undisputed, the only question presented is a legal one of the

sentencing court's application of the guidelines to the facts,

requiring de novo review. "[Q]uestions . . . of the proper 

application of a legal standard to undisputed facts . . . are

usually called 'mixed questions' of fact and law." United States 

v. Wright, 973 F.2d 437, 442 (1st Cir. 1989). As our cases in 

this context amply demonstrate, such issues of sentencing

application are often difficult to pigeonhole as either

predominantly factual or legal. See, e.g., United States v. 

Newman, 982 F.2d 665, 671 (1st Cir. 1992); United States v. 

Pilgrim Market Corp., 944 F.2d 14, 16 (1st Cir. 1991); United 

States v. Cousens, 942 F.2d 800, 805-07 (1st Cir. 1991); United 

States v. Rule Indus., 878 F.2d 535, 542 n.7 (1st Cir. 1989). 

Because we remand the unusually vulnerable victim issue to the

district court we need not decide the difficult standard of

review question.

Section 3A1.1(b) of the Sentencing Guidelines calls for

a two level upward enhancement

[i]f the defendant knew or should have known
that a victim of the offense was unusually
vulnerable due to age, physical or mental
condition, or that a victim was otherwise
particularly susceptible to the criminal
conduct.

We have recognized that this guideline "is primarily concerned

with the impaired capacity of the victim to detect or prevent the

crime, rather than the quantity of harm suffered by the victim."

United States v. Gill, 99 F.3d 484, 486 (1st Cir. 1996). The 

question is whether "'a particular victim was less likely to

-8-

thwart the crime, rather than more likely to suffer harm if the

crime is successful.'" Id. (quoting United States v. Kaye, 23 

F.3d 50, 54 (2d Cir. 1994)).

We have discouraged sentencing courts from making an

"unusually vulnerable victim" finding based solely on the

victim's membership in a particular class. Id. at 487; United 

States v. Feldman, 83 F.3d 9, 15 (1st Cir. 1996) ("[I]n order to 

warrant a finding of unusual vulnerability, there must be some

evidence, above and beyond mere membership in a large class, that

the victim possessed a special weakness that the defendant

exploited."). At the same time, we have recognized that in some

cases inferences to be drawn regarding particular class

characteristics may be so strong that "there can be little doubt

about unusual vulnerability of class members within the meaning

of section 3A1.1." Gill, 99 F.3d at 487. The Sentencing 

Commission recognized this when it used as an example under this

section the robbery of someone confined to a wheelchair. See 

U.S.S.G. 3A1.1 comment. n.2; see also Gill, 99 F.3d at 487. 

We are concerned with the application of section 3A1.1

in the context of this case. The PSR revealed that Fosher

surveyed the victim's home and determined that it was occupied by

an elderly woman, her daughter, and her daughter's infant.

Following this surveillance, the perpetrators declined the use of

weapons to commit the robbery. Based on the victim's age and the

perpetrators' decision that the use of weapons would not be

necessary, the district court concluded that Fosher knew or

-9-

should have known that the victim in this case would have

"impaired capacity" to prevent the entry into and robbery of her

home. From our review of the record, it appears the district

court failed to address the "individual characteristics" required

to support a finding that a particular victim was unusually

vulnerable. Because of this conclusion, we must remand this

issue to the district court for its consideration.

-10-

II. Role in the offense II. Role in the offense

We review a district court's role in the offense

determinations for clear error. See United States v. D'Andrea, 

107 F.3d 949, 956 (1st Cir. 1997). A court making a four-level

role-in-the-offense adjustment under U.S.S.G. section 3B1.1(a)

must first determine "whether the defendant acted as an

organizer/leader of a specific criminal activity. If so, the

court asks the separate question of whether that criminal

activity involved five or more participants, defined in the

Commentary as persons who are 'criminally responsible for the

commission of the offense . . . .'" United States v. Preakos, 

907 F.2d 7, 10 (1st Cir. 1990) (quoting U.S.S.G. 3B1.1,

Commentary). In determining a defendant's role in the offense,

the sentencing court need not look only to the elements

underlying the conviction, but may consider "the whole of the

defendant's relevant conduct." United States v. Savoie, 985 F.2d 

612, 615 (1st Cir. 1993); see also U.S.S.G. Ch. 3, Pt. B, intro. 

comment. Fosher does not challenge the sentencing court's status

determination. His argument focuses on whether the district

court properly found five participants in the home invasion and

robbery.

The commentary defines a "participant" as "a person who

is criminally responsible for the commission of the offense, but

need not have been convicted." U.S.S.G. 3B1.1 comment. app.

n.1. Fosher concedes that there were four criminally responsible

participants: him, Chinn, Corso, and Schoff. At the sentencing

-11-

hearing, the government argued that both Philip Corso and Bomengo

were criminally responsible participants even though they did not

actually participate in the robbery. We need only confirm that

one of them was a criminally responsible participant to affirm

the district court's upward adjustment. Philip Corso's

assistance in devising the perpetrator's scheme is sufficient to

find that he is a participant within the meaning of the

guidelines. Philip Corso assisted Schoff in targeting the

victim's home for the commission of this robbery, he provided the

home in which the planning meeting took place, he participated in

the planning meeting with the four robbery perpetrators, and, in

response to the perpetrators' discussion regarding the use of

weapons, he advised against the necessity of weapons to gain

entry into the victim's home. Such acts were sufficient to find

Philip Corso to be a participant in the commission of this

robbery. We therefore find no error in the district court's role

in the offense determination.

III. Criminal History Category III. Criminal History Category

In 1977, Fosher was convicted of armed bank robbery

under the Federal Youth Corrections Act, 18 U.S.C. 5005 et seq. 

(repealed 1984). In 1982, pursuant to the Act's set-aside

provisions, see 18 U.S.C. 5021, Fosher was unconditionally 

discharged and his conviction was set aside. Fosher challenges

the sentencing court's inclusion of his FYCA set-aside conviction

in the calculation of his Criminal History Category. He claims

that his set-aside conviction is to be treated as an "expunged"

-12-

conviction under U.S.S.G. 4A1.2. We have yet to address the

issue of whether a conviction set aside under the FYCA should be

counted under the Sentencing Guidelines.4 When faced with this

issue, a majority of our sister circuits have ruled that an FYCA

conviction may properly be included in calculating a defendant's

criminal history, see United States v. Moreno, 94 F.3d 1453 (10th 

Cir. 1996); United States v. Nicolace, 90 F.3d 255 (8th Cir. 

1996); United States v. Wacker, 72 F.3d 1453 (10th Cir. 1996); 

United States v. Levi, 45 F.3d 453 (D.C. Cir. 1995); United 

States v. Ashburn, 20 F.3d 1336 (5th Cir. 1994); United States v. 

Gardner, 860 F.2d 1391 (7th Cir. 1988), while only one has 

determined that FYCA convictions are similar to expunged

convictions and should not be considered under the guidelines,

see United States v. Kammerdiener, 945 F.2d 300 (9th Cir. 1991).5 
 

4 Fosher claims that two opinions of this circuit relating to
the FYCA support his contention that his set-aside convictions
may not be included in calculating his criminal history. Both
opinions are inapposite, as neither was decided under the
Sentencing Guidelines. See United States v. Doe, 732 F.2d 229, 
232 (1st Cir. 1984) (ruling that FYCA does not allow record of
conviction to be destroyed and noting that the FYCA set aside
provision "prevents the fact of conviction from being used to the
youth offender's legal detriment"); Mestre Morera v. INS, 462 
F.2d 1030, 1032 (1st Cir. 1972) (in ruling that FYCA conviction
may not be used to deport petitioner, finding that purpose of
FYCA is to give an offender "a second chance, free of all taint
of a conviction").

5 Fosher also cites opinions from two other circuits for
support, but none of those opinions ruled that FYCA set-aside
convictions are not to be counted under the guidelines criminal
history provisions. See United States v. Corrado, 53 F.3d 620, 
621 n.1 (3d Cir. 1995) (noting that government conceded that FYCA
conviction should not be counted); United States v. Doe, 980 F.2d 
876 (3d Cir. 1992) (ruling that FYCA's set aside provisions
called for the actual removal of any records related to
conviction); United States v. Beaulieau, 959 F.2d 375, 380-81 (2d 

-13-

Section 4A1.2(j) provides that expunged convictions are

not to be counted in determining Criminal History Category. The

Commentary provides the following:

A number of jurisdictions have various
procedures pursuant to which previous
convictions may be set aside or the defendant
may be pardoned for reasons unrelated to
innocence or errors of law, e.g., in order to 
restore civil rights or to remove the stigma
associated with a criminal conviction.
Sentences resulting from such convictions are
to be counted. However, expunged convictions
are not to be counted.

U.S.S.G. 4A1.2, comment app. note 10. A set-aside under the

FYCA is made for "reasons unrelated to innocence or errors of

law" of the type that the guidelines contemplate are to be

considered in calculating Criminal History. The FYCA, section

5021, provided:

(a) Upon the unconditional discharge by the
Commission of a committed youth offender
before the expiration of the maximum sentence
imposed upon him, the conviction shall be
automatically set aside and the Commission
shall issue to the youth offender a
certificate to that effect.

(b) Where a youth offender has been placed
on probation by the court, the court may
thereafter, in its discretion,
unconditionally discharge such youth offender
from probation prior to the expiration of the
maximum period of probation theretofore fixed
by the court, which discharge shall
automatically set aside the conviction, and
the court shall issue to the youth offender a
certificate to that effect.

 

Cir. 1992) (holding that sealed record under Vermont juvenile
statute was improperly considered in criminal history
calculation).

-14-

18 U.S.C. 5021 (repealed). The language of the statute does

not call for expunging a youth offender's records, but instead

mandates that the youth offender shall receive a certificate to

the effect that the conviction has been set aside. A conviction

under the FYCA is set aside not because of legal error or

innocence, but because the offender's "post-offense conduct has

persuaded the court to terminate his sentence of probation before

the assigned completion date." United States v. McDonald, 991 

F.2d 866, 871 (D.C. Cir. 1993) (analyzing a set-aside conviction

under the District of Columbia's Youth Rehabilitation Act,

analogous to the FYCA). The FYCA's use of the term "set aside"

is not the same as the Guideline's treatment of "expunged"

convictions, but is more analogous to the Guideline's definition

of a "set aside" conviction, one that is to be counted in the

criminal history calculation. Moreover, had Congress intended

that all records of a youthful conviction under the FYCA be made

completely unavailable or destroyed such that they could no

longer be considered for any future purposes, Congress could have

specified the remedy of expungement rather than a certificate of

set-aside. See United States v. Doe, 732 F.2d 229, 232 (1st Cir. 

1984) (in affirming district court's refusal to destroy FYCA

records, noting that ordering expungement under the statute would

require a rewriting of the statute); Ashburn, 20 F.3d at 1342 

(collecting cases).

In determining the import of this provision, the

Supreme Court noted in dicta that the FYCA was intended to

-15-

address the "numerous civil and social disabilities" that

accompany a conviction, recognizing that "a conviction may result

in the loss of the rights to vote, to hold a public office, to

serve on a jury, and to practice various occupations and

professions." Tuten v. United States, 460 U.S. 660, 664 (1983). 

Although the FYCA was intended to benefit a youthful offender by

providing a second chance to start life without the stigma of a

criminal conviction, id. ("Congress' purpose in adopting 5021 

was to promote the rehabilitation of youth offenders by providing

a substantial incentive for positive behavior while serving a

sentence under the YCA."); Webster, 606 F.2d at 1234-35 (noting 

that Congress "intended to give youthful ex-offenders a fresh

start, free from the stain of a criminal conviction, and an

opportunity to clean their slates to afford them a second chance,

in terms of both jobs and standing in the community"), it was not

meant to allow a recidivist to avoid increased penalties based on

earlier criminal convictions. See Ashburn, 20 F.3d at 1343 

("[T]his beneficent offer of a 'second chance' to the immature

offender should not be available as a shield for those whose

original encounter with the criminal world is used as a

springboard to a life of felonious conduct."); McDonald, 991 F.2d 

at 872 ("[I]f a juvenile offender turns into a recidivist, the

case for conferring the benefit dissipates. Society's stronger

interest is in punishing appropriately an unrepentant criminal."

(citations omitted)). Thus, counting an FYCA set-aside

-16-

conviction in calculating a defendant's criminal history is not

contrary to the purposes of the FYCA.

Fosher further argues that consideration of the FYCA

conviction violates the ex post facto clause, U.S. Const. art. I, 

9, cl. 3, because the law increases the punishment for his 1977

armed robbery conviction. An ex post facto law is one "'that 

changes the punishment, and inflicts a greater punishment, than

the law annexed to the crime, when committed.'" Dominique v. 

Weld, 73 F.3d 1156, 1162 (1st Cir. 1996) (quoting Miller v. 

Florida, 482 U.S. 423, 429 (1987)). "The concern of the ex post 

facto prohibition is to assure that legislative acts 'give fair 

warning of their effect and permit individuals to rely on their

meaning until explicitly changed.'" United States v. Forbes, 16 

F.3d 1294, 1301 (1st Cir. 1994) (quoting Miller, 482 U.S. at 430 

(1987)). As the Supreme Court has recognized, a state habitual

offender statute, which increased present penalties based on

prior criminal conduct, is not an ex post facto law, because the 

consideration of prior convictions imposes increased penalties to

the "latest crime, which is considered to be an aggravated

offense because a repetitive one." Gryger v. Burke, 334 U.S. 

728, 732 (1948), quoted in Forbes, 16 F.3d at 1302. "Gryger thus 

recognized the legislature's authority to enact an enhanced

penalty for future conduct preceded by a criminal conviction

obtained prior to enactment of the enhanced penalty provision."

Forbes, 16 F.3d at 1302. The district court's consideration of 

-17-

Fosher's FYCA conviction in determining his criminal history

category did not violate the ex post facto clause. 

CONCLUSION CONCLUSION

For the foregoing reasons, we reverse and remand in reverse remand 

part, and affirm in part. affirm 

-18-